Morton R. GODINE, Edward Goldman, and Emmanuel Kurland, Executors of the Will of Harold D. Ashe, Plaintiffs,

v.

LIBERTY SHOE CO., Inc., and Small Business Administration, Defendants.

Civ. A. No. 64–826.

United States District Court
D. Massachusetts.

July 12, 1967.

————◇————

Franklin N. Flaschner, Singer, Stoneman & Kurland, Boston, Mass., for plaintiffs.

Philip Strome, Salem, Mass., for Liberty Shoe Co., Inc.

Paul F. Markham, U. S. Atty., Stanislaw R. J. Suchecki, Asst. U. S. Atty., for Small Business Administration.

## OPINION

JULIAN, District Judge.

This case has been submitted for decision by the Court on an agreed statement of facts.

The plaintiffs, Godine, Goldman and Kurland, are the duly appointed executors of the will of Harold Ashe. The defendant Liberty Shoe Co., Inc. (hereinafter referred to as "Liberty") is a corporation organized under the laws of the Commonwealth of Massachusetts and has its principal place of business in Haverhill, Massachusetts.

On July 26, 1960, Harold Ashe and Henry Solar, the sole owners of all of the outstanding stock of Liberty, entered into a Stock-Purchase Agreement with Liberty and Old Colony Trust Company (hereinafter referred to as "Old Colony"). The expressed purpose of the agreement was "to provide for the purchase of a decedent stockholder's interest in the corporation and to provide the funds necessary to carry out such purpose."

Under this agreement Liberty was required to deposit certain life insurance policies on the lives of Ashe and Solar with Old Colony as trustee. The total amount of the policies on the life of Ashe was $320,000. Liberty was the owner of these policies and was required to pay the premiums on them. The agreement further stated that Liberty shall be considered the beneficial owner of the policies and that any dividends payable thereon prior to maturity by death of the insured were to be paid to Liberty. Liberty took such steps as were necessary to have Old Colony named beneficiary of the policies.

Ashe and Solar were required to execute assignments in blank of all of the shares of stock in their respective names (650 shares in Ashe's name and 250 shares in Solar's name), and to deliver them to Old Colony as trustee.

Upon the death of either stockholder the trustee was to collect the proceeds of the insurance policies. The executor or administrator of the stockholder's estate was to sell the stock held by the trustee to Liberty at a price which should be fixed according to the formula stated in paragraph 7 of the agreement. In the case of Ashe, the price was to be $320,000 plus 65 per cent of net profits earned by Liberty, if any, after May 31, 1959, to the last day of the month prior to the death of Ashe. In the event that the insurance proceeds were not sufficient to pay this price, the Corporation was to pay the balance, if permitted by law, to the trustee. The trustee, in turn, would pay the full purchase price to the legal representative or heirs of the deceased stockholder and turn the stock in question over to the Corporation.

On January 31, 1962, an Agreement of Intent was entered into by Ashe, Solar and Liberty which was to supersede the Stock-Purchase Agreement in any respect in which they were inconsistent. According to the Agreement of Intent, three of the insurance policies owned by Liberty on the life of Ashe in the total sum of $125,000 were assigned by Liberty to the Small Business Administration (hereinafter referred to as SBA) to partially secure a loan from SBA to Liberty in the total sum of $250,000. The Agreement of Intent further stated that in the event of the death of Ashe, the proceeds of these three policies remaining after the payment of the loan from SBA to Liberty were to be paid to the Estate of Ashe. The other policies owned by Liberty on the life of Ashe in the total amount of $195,000 previously held by Old Colony as trustee were to be sold and transferred immediately to Ashe for their cash surrender value. Liberty was to continue paying the premiums on the policies assigned to SBA.

On February 2, 1962, another Agreement was entered into between Ashe, Solar, Liberty and Old Colony which expressly stated that the Agreement of Intent of January 31, 1962, was to take effect as an amendment to the Stock-Purchase Agreement of July 26, 1960. In addition, this last agreement replaced Old Colony as trustee by Dean Nicholson (hereinafter referred to as Nicholson).

When Liberty applied for and received the loan from SBA, Liberty was heavily in debt, its operations were producing a minimal net profit, and it was unable to obtain from other sources on reasonable terms the financial assistance it needed and applied for.[1]

On February 7, 1962, SBA made the loan to Liberty mentioned above in the principal amount of $250,000. This loan was secured by the following:

(a) The personal joint and several guaranty of Ashe and Solar;

(b) An Equipment Security Agreement executed by Liberty, together with appropriate financing statements, duly recorded;

(c) An Inventory Security Agreement executed by Liberty, with appropriate financing statements, duly recorded; and

(d) The above-mentioned assignments of $125,000 of life insurance policies as collateral executed by Ashe and Liberty, as well as assignments of other life insurance policies in the amount of $125,000 on the life of Solar executed by Solar and Liberty. (A total of $250,000 of life insurance was thus assigned.)

When this first loan was made on February 7, 1962, SBA had received a photostat of a signed copy of the original Stock-Purchase Agreement dated July 26, 1960. SBA also received on or about April 26, 1962, original counterparts of the Agreement of Intent dated January 31, 1962, and the Agreement dated February 2, 1962, amending the Stock-Purchase Agreement.

The $250,000 proceeds of the first loan were disbursed to Liberty by SBA as follows:

| | |
|---|---|
| February 7, 1962 | $175,000.00 |
| March 5, 1962 | 25,000.00 |
| August 6, 1962 | 30,470.24 |
| October 17, 1962 | 5,433.67 |
| October 31, 1962 | 14,096.09 |
| | $250,000.00 |

On April 15, 1962, Ashe died, and SBA learned of his death four of five days later. Thereafter SBA wrote to the Metropolitan Life Insurance Company, requesting the insurance proceeds payable on account of Ashe's death and surrendering the three policies on Ashe's life. On May 22, 1962, SBA received two checks from the insurance company, one in the amount of $75,574.16 and the other in the amount of $50,181.50, for an aggregate of $125,755.66 representing the total amount of the death proceeds payable on the three policies on Ashe's life which had been collaterally assigned to SBA. Upon receipt, these checks were held by SBA pending determination of their disposition.

In the meantime, on May 3, 1962, Liberty, acting through Solar as president, and Ashe's estate acting through Dorothy R. Ashe, his widow and executrix named in his will, made a written request to SBA not to apply the proceeds of the policies to payment of the loan but to continue to hold the same as collateral security.

SBA answered this request by its letter dated June 18, 1962, to Liberty, with copies to counsel for Liberty, counsel for Ashe's estate, and to the participating bank in the first loan, Haverhill National Bank. In this letter SBA declined the request and informed Liberty that the proceeds would be applied to the loan. Pursuant thereto on June 22, 1962, SBA did apply said $125,755.66 of life insurance proceeds to the outstanding principal of the loan (hereinafter referred to as the first loan) in the inverse order of maturity. No part of said proceeds was retained as cash collateral.

At the time of Ashe's death and at the time of the aforesaid application of life insurance proceeds to the first loan in the inverse order of maturity, the loan was not in default according to SBA's records, nor was there ever any default in the first loan according to SBA's records during the entire existence of the first loan as an outstanding obli-

---

1. See 15 U.S.C. § 636(a) (1)

gation. According to an audit report dated October 4, 1962,[2] filed in due course with SBA and prepared by Selsberg, Bayard & Company, accountants and auditors, the financial condition of Liberty on May 31, 1962, showed a total net worth of $278,647.86 after crediting the application of the life insurance proceeds as aforesaid. The 1,000 shares of issued capital stock were listed at $278,-135.92. It does not appear how this figure was arrived at. The report also showed a net income of only $8,910.42 against total sales of $4,871,455.91.

On April 23, 1962, Ashe's 650 shares of Liberty stock were turned back to the corporation and held thereafter by the corporation as treasury stock. The "Loan Agreement" (Exh. 2) dated February 7, 1962, executed in behalf of Liberty by Ashe as its president and treasurer, provided as follows: "Borrower will not, without the prior written consent of SBA * * * purchase or retire any of its capital stock * * *." SBA never consented to the purchase or retirement of Ashe's shares by Liberty.

■ In prohibiting Liberty to purchase or retire its capital stock without SBA's prior consent, SBA intended to protect itself as well as Liberty, which it was assisting,[3] against stock purchasing agreements that might weaken the financial condition of Liberty by diverting corporate assets to the shareholders in return for shares that might have no market and little or no actual value. Since the provision prohibiting Liberty from purchasing or retiring any of its capital stock without SBA's prior written consent was contained in the "Loan Agreement" (Exh. 2) which was executed in behalf of Liberty by Ashe as

its president and treasurer, Ashe, and therefore the plaintiffs, must be charged with knowledge of the provision.

The stock purchase agreements between Ashe and Solar on the one hand and Liberty on the other were not agreements entered into at arm's length. Ashe and Solar were the sole owners of all of Liberty's outstanding stock and were Liberty's principal officers. The agreements were made primarily for the benefit of Ashe and Solar and their estates. Liberty entered into the agreements through Ashe and Solar in their capacity as officers of the corporation.

In the original stock purchase agreement the agreed purchase price for Ashe's 650 shares was $320,000 plus 65 per cent of the corporation's net profits, if any, for a stated period, and for Solar's 250 shares the agreed price was $100,000 plus 25 per cent of the corporation's net profits for a stated period, and to the extent that funds from the proceeds of the life insurance were insufficient "the Corporation will, if permitted by law, pay for the balance of the purchase price" (see par. 7 of Exh. 14). It is entirely unclear whether the "Agreement of Intent" dated January 31, 1962 (Exh. 12) and the "Agreement" dated February 2, 1962 (Exh. 13) were intended to increase or diminish the purchase price. Thus, exclusive of the unknown value of the percentages of the net profits and the value of the pensions provided for the widows of Ashe and Solar in the "Agreement of Intent," the total price to be paid by Liberty, under the original agreement, for the 900 issued shares was $420,000. There is no evidence to indicate that this price reflected the actual value of the stock. There is no evidence

---

**2.** Appended to the report is the following "Auditors' Opinion": "While our examination included a careful review of your books and other pertinent records, it did not include a sufficient independent verification of the company's assets, liabilities, income or expense accounts necessary to express an opinion on the accompanying financial statements."

**3.** In Royal Services, Inc. v. Maintenance, Inc., 1966, 5 Cir., 361 F.2d 86, 92, the court stated: "The declared purpose of the Small Business Act is to preserve and expand full and free competition for the economic well-being and security of the Nation, by encouraging and developing the actual and potential capacity of small business, through aiding, counseling, encouraging, assisting and protecting the interests of small businesses."

that there ever was a market for the stock. There is no reliable evidence of the actual value of the stock at any time. From all the evidence it is fairly inferable that the agreed price far exceeded the actual value of the stock and was in fact an arbitrary figure.

Demands were made by Ashe's estate through counsel on Liberty for payment for the stock that was turned back to Liberty but no payment has ever been received by the estate.

On March 9, 1964, the first loan was paid off in full. No security for the first loan was used or applied in this connection except the aforesaid application of life insurance proceeds. The balance of principal and interest was then $46,-686.43, of which $46,512.77 was principal and $173.66 was interest. All of the security put up by Liberty, Ashe and Solar to secure the first loan was discharged and released. The note of February 7, 1962, evidencing the first loan, was stamped "Replaced by refunding Note dated 3–5–64 in the amount of $150,000.00," and was returned to Liberty by SBA.

The source of the funds to pay off the balance of the first loan was a second loan[4] made by SBA to Liberty on March 5, 1964, in the principal amount of $150,-000. The balance over and above the amount required to pay off the first loan was disbursed to Liberty on March 9, 1964. The second loan was secured by:

(a) Personal guaranties of Solar and Earl L. Katz (hereinafter referred to as Katz), the then principal officers and sole stockholders of Liberty;

(b) Equipment Security Agreement, financing statements for which were duly executed and recorded; and

(c) Collateral Assignments of life insurance policies on the lives of Solar and Katz.

After the death of Dorothy R. Ashe, Ashe's widow and executrix under his will, plaintiffs Godine, Goldman and Kurland were appointed executors on July 12, 1963. The executors had no notice or knowledge of the first loan being paid off and the second loan being granted until shortly after April 23, 1964, when the matter was mentioned to Kurland by Richard Shea of SBA in the course of a telephone conversation in response to a letter written by Kurland to Shea dated April 23, 1964, inquiring as to the status of the first loan. At no time while the first loan was outstanding did the representatives of Ashe's estate tender payment thereof.

According to the financial statements for eight months ending January 31, 1964, and the audit report for the year ending May 31, 1964, filed in due course with SBA and prepared by the aforesaid Selsberg, Bayard & Company, on those dates respectively Liberty had a total net worth of $209,248.63 and $168,431.18. The financial statements for the eight months ending January 31, 1964, showed a net profit of $3,545.13. The audit report for the year ending May 31, 1964, showed a net loss of $45,733.63.

Payments on the second loan were made by Liberty to SBA in accordance with the note through September 4, 1964. On October 6, 1964, Liberty made an assignment of all its assets for the benefit of creditors to Philip Strome, Esq., of Salem, Massachusetts. On October 13, 1964, this action by Ashe's estate against SBA and Liberty was commenced in the Massachusetts Superior Court in and for the County of Middlesex and thereafter removed by SBA to the United States District Court for the District of Massachusetts.

Pursuant to a stipulation between SBA and the Assignee, a public auction was held to sell the assets of Liberty. The total proceeds of the sale amounted to $180,049.23, of which $131,178.24, or

---

4. The Small Business Act, 15 U.S.C. § 636, provided as follows:

"(c) The Administration may further extend the maturity of or renew any loan made pursuant to this section, * * * if such extension or renewal will aid in the orderly liquidation of such loan."

72.86 per cent, represented machinery, lasts, dies and patterns included in SBA's Equipment Security Agreement securing the second loan, and $48,870.99, or 27.14 per cent, represented inventory in which SBA did not have a security interest. Although there had been an Inventory Security Agreement in connection with the first loan, there was no such agreement in connection with the second loan. SBA and the Assignee shared the expenses of the sale in the proportions as set forth above and the commissions charged by the auctioneer were deducted from the receipts of each.

The net remittance to SBA from this sale was $119,846.42. SBA also received $1,385 prior to the auction sale for the sale of two machines included in SBA's Equipment Security Agreement, and $13,379.01 as the cash surrender values of the life insurance policies it held on the lives of Solar and Katz. These payments to SBA amounted to $134,610.43. A final payment of $5,532.97 was made by the Assignee to SBA to pay off the balance of the principal and interest of the second loan in full.

All of the machinery, lasts, dies and patterns sold in the auction sale on November 12, 1964, and the two machines sold previously for $1,385 were included in the list of property accompanying the Equipment Security Agreement given by Liberty to SBA to secure the second loan.

The executors of the will of Ashe have brought this action on each of two theories.

Under the first theory, the plaintiffs allege that the policies on the life of Ashe were assigned by Liberty to SBA merely as collateral for the first loan; and that in the absence of a default by Liberty in making payments on the loan, SBA had no right to apply the proceeds of the insurance policies to the payment of the loan. Plaintiffs allege that the interest of Ashe, and later Ashe's estate, in the insurance and its $125,755.66 proceeds was that of equitable owner. Therefore, plaintiffs contend, SBA's wrongful application of the insurance proceeds constituted a *conversion* of property equitably owned by Ashe's estate.

Under the second theory, plaintiffs contend that Ashe (and later his estate) was the equitable owner of the policies which were pledged as collateral for the first SBA loan to Liberty. When SBA applied the proceeds of the policies to partial payment of that loan, whether rightly or wrongly, the equitable owner became subrogated to the security interest which the creditor, SBA, retained in all other collateral pledged on the first loan, namely, the equipment and inventory of Liberty and the insurance policies on the life of Solar. Because SBA was on notice of the equitable interest of the plaintiffs in the proceeds of the policies when it applied them, and therefore at least constructively had notice of the subrogation rights of the plaintiffs, SBA's security interest taken as collateral for the second loan in the equipment of Liberty and the insurance policies on the life of Solar was subordinate to the plaintiffs' subrogated rights of security in that property. After the sale of Liberty's assets, SBA realized a net amount of $121,231.42 on the equipment and $13,379.01 on the insurance on Solar, making a total fund of $134,610.43. The plaintiffs seek to recover on this subrogation theory the amount of the Ashe insurance proceeds, $125,755.66, out of that fund, or alternatively out of the funds of Liberty presently in the hands of Liberty's assignee for the benefit of creditors.

Considering first the plaintiffs' conversion theory, I find that SBA expressly reserved the right to apply the proceeds of the life insurance to the loan without waiting for maturity. In the assignment of each of the three insurance policies it is stated that SBA covenants and agrees with Harold Ashe, the insured, and Liberty, the beneficiary,

"that any balance of sums received hereunder from the Insurer remaining after payment of the then existing liabilities, matured or unmatured, shall be paid by the Assignee [SBA] to the persons entitled thereto under the

terms of the Policy had this assignment not been executed." (Exhs. 6, 7, 8.)

Each assignment was signed by Ashe, both in his personal capacity as the Insured and in his capacity as president and treasurer of Liberty. This clause refers to payment of the "then existing" liabilities. I interpret the words "then existing" to refer to the point in time just previously referred to in the same sentence, namely, the time of receipt of sums "from the Insurer." The sentence further refers to payment of existing liabilities at that point of time whether "matured or unmatured." The assignments further protect SBA in its application of the proceeds to the unmatured liabilities by stating that SBA "may apply to the liabilities in such order as the Assignee [SBA] shall determine, the proceeds of the Policy hereby assigned or any amount received on account of the Policy by the exercise of any right permitted under this assignment, without resorting or regard to other security."

This interpretation is consistent with the Agreement of Intent of January 31, 1962, between Ashe, Solar and Liberty wherein it was stated that:

"Policies of life insurance owned by Liberty Shoe Co., Inc. insuring the life of Harold D. Ashe and being policies numbered 22241542, 22241662A and 24411190A in the total sum of One Hundred Twenty-Five Thousand Dollars ($125,000.00) issued by the Metropolitan Life Insurance Company have been assigned by Liberty Shoe Co., Inc. to Small Business Administration. In the event of the death of Harold D. Ashe, the proceeds of the said policies *remaining after the payment of the loan* from the Small Business Administration to Liberty Shoe Co., Inc. are to be paid to the Estate of Harold D. Ashe." (Emphasis added.) (Exh. 12, ¶ 2.)

I find, therefore, that under the assignments of the policies in question SBA had the right to apply the proceeds of the policies to the unmatured liabilities of Liberty on the first loan and that there was no conversion of funds.[5]

Considering now the plaintiffs' theory of subrogation to the security rights of SBA in the equipment and inventory of Liberty and the insurance policies on the life of Solar, all of which were pledged as collateral security on the first loan, I find that the specific interest retained by Ashe in the proceeds of the assigned policies on his life precludes recovery under this theory. The plaintiffs argue that once a creditor (SBA) has applied collateral owned by a third party (Ashe) to payment of the loan to a debtor (Liberty), the third party owner is subrogated to the position of the creditor in regard to whatever other

---

5. An additional indication of the fact that all parties concerned fully realized that under the assignments of insurance policies SBA had the right to apply the proceeds to unmatured liabilities of Liberty on the loan at the time of Ashe's death is found in the letter of May 3, 1962, from Liberty and the Estate of Ashe to SBA. (Exh. 17.) The letter was written after the death of Ashe and before application by SBA of the insurance proceeds. After the letter outlines the stock purchase agreement as amended, it states, in pertinent part:

"The Agreement of Intent further provided that in the event of the death of Harold D. Ashe the proceeds of the policies assigned to the Small Business Administration remaining after the payment of the loan from the Small Business Administration to Liberty Shoe Co., Inc. are to be paid to the Estate of Harold D. Ashe. Liberty Shoe Co., Inc. and the Estate of Harold D. Ashe, acting through the executrix named in his Will, hereby *jointly request* that said proceeds not be applied now to payment of the loan but that Small Business Administration continue to hold the same as collateral security." (Emphasis added.)

If it had been contemplated by Liberty or Ashe's estate that SBA could not legally apply the proceeds immediately upon receipt of them without awaiting default on the part of Liberty, there would seem to be no purpose to "requesting" SBA to refrain from doing what it had no right to do. There is a significant lack of any mention in the letter of an *obligation* on the part of SBA to continue to hold the proceeds as collateral.

security was pledged by the debtor.[6] The plaintiffs proceed on the assumption that Ashe was the equitable owner of the proceeds of the insurance policies which amounted to $125,755.66. Even if the nature of Ashe's interest in the insurance policies were that of an equitable owner, that interest would not extend to the entire proceeds. Under the Agreement of Intent of January 31, 1962, between Ashe, Solar and Liberty (Exh. 12) which took effect as an amendment to the original Stock-Purchase Agreement of 1960, the interest of Ashe and Ashe's Estate in the insurance proceeds was clearly defined as follows:

"In the event of the death of Harold D. Ashe, the proceeds of the said policies *remaining after the payment of the loan* from the Small Business Administration to Liberty Shoe Co., Inc. are to be paid to the Estate of Harold D. Ashe." (Emphasis added.)

Since the proceeds of these policies were applied in full to the loan, there was nothing "remaining after the payment of the loan." The quoted language of the Agreement of Intent (Exh. 12) clearly indicates that it was the intent of the parties that if Ashe should die before the first loan to Liberty was paid off and any of the proceeds were applied to that loan, Ashe's estate should have no right to recoup the amount applied.

Since neither Ashe nor his estate paid any part of Liberty's indebtedness to SBA, and since no property of any kind belonging to Ashe or his estate was applied to the payment of such indebtedness, plaintiffs' claim to subrogation is without basis.

6. The plaintiffs do not rely on any *wrongful* application of proceeds by the SBA under this theory. They contend that the subrogation takes effect *"whether or not* SBA's application of the insurance was wrongful." (Brief of the Petitioners, p. 19.) (Emphasis added.)

* On August 9, 1967 the Court of Appeals for the Second Circuit affirmed the order of the District Court in an unreported decision reading as follows:

The plaintiffs, therefore, are not entitled to recover on the theory of subrogation.

I therefore find for the defendants and order that judgment be entered accordingly.