**Morton R. GODINE et al., Executors, Plaintiffs, Appellants,**

v.

**LIBERTY SHOE CO., Inc., et al., Defendants, Appellees.**

**No. 7026.**

United States Court of Appeals First Circuit.

June 7, 1968.

---

Franklin N. Flaschner, Boston, Mass., with whom Ronald D. Dockser and Singer, Stoneman & Kurland, Boston, Mass., were on brief, for appellants.

Philip Strome, Salem, Mass., Assignee of Liberty Shoe Co., Inc., appellee, pro se.

Stanislaw R. J. Suchecki, Asst. U. S. Atty., with whom Paul F. Markham, U. S. Atty., was on brief, for United States of America, appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

This action, brought in the Massachusetts Superior Court against Liberty Shoe Company, Inc., hereafter Liberty, and Small Business Administration, SBA, was removed by the latter to the district court under 28 U.S.C. § 1442(a). Garden Homes, Inc. v. Mason, 1 Cir., 1957, 249 F.2d 71, cert. denied 356 U.S. 903, 78 S.Ct. 562, 2 L.Ed.2d 580; Jones v. Elliott, E.D.Va., 1950, 94 F.Supp. 567. The case was tried upon a stipulation of facts and exhibits. The court found against plaintiffs, 271 F.Supp. 97, who now appeal.

Plaintiffs are the executors of Harold Ashe, and their claim ultimately derives from a stock purchase agreement made in 1960 between Ashe, Henry Solar, and Liberty, as amended. Ashe and Solar were the chief officers and sole owners of Liberty, Ashe owning 650 shares and Solar 250 shares. The agreement provided that the shares of the stockholder who died first were to be sold back to Liberty. In return, the executors were to receive $320,000 plus 65% of Liberty's net profits after May 31, 1959, in the case of Ashe, or $100,000 plus 25% of the net profits in the case of Solar. To

safeguard payment, life insurance policies of $320,000 on Ashe and $150,000 on Solar (later apparently increased to $200,000) were deposited by Liberty with a trustee, as were the shares, but it was provided that if the proceeds of these policies were insufficient Liberty would have to pay the full amount or, if this was not legal,[1] receive a proportionally smaller number of shares. The insurance policies were owned by Liberty, which agreed to continue the premiums.

Apparently Liberty did not flourish. In 1962, it borrowed $250,000 from SBA. Various collateral was provided, including personal guarantees (never drawn on) by Ashe and Solar and an assignment to SBA out of the trust of $125,000 of life insurance on each of them. This required amendments to the 1960 agreement, which we shall consider later. A few months afterward Ashe died, and the proceeds of the assigned policies on his life were applied to the loan by SBA. Liberty made further payments on the loan, and in 1964 paid the balance with about a third of a second SBA loan of $150,000. Not long after this, Liberty assigned all its assets for the benefit of its creditors. The assets were sold and most of the proceeds used to pay the second SBA loan. The rest await distribution to other creditors.[2]

Plaintiffs advance a series of propositions. In their view, the 1960 agreement gave Ashe an equitable interest in the insurance policies on his life from which the amount due him, if he died before Solar, would probably be paid. They consider the 1962 amend-

ments and the loan documents a pledge of this interest as security for Liberty's debt to SBA, so that when the insurance was used to pay the loan SBA's rights against Liberty accrued to them, by way of subrogation, as substitute collateral. As subrogees under the first loan, they assert SBA's priority over other creditors under 31 U.S.C. § 191, and priority over SBA's own rights under the second loan because this was allegedly made with knowledge of their claim. We need not explore these matters, since we conclude that the 1962 amendments were not intended as a pledge of Ashe's interest in the insurance policies but as a renegotiation of that interest, in diminution of Liberty's debt.

The 1962 changes were made in three parts: a declaration of intent, a formal amendment incorporating it, and the assignment of the insurance to SBA. We will refer to them collectively as the amendment. The amendment provided that, in case of Solar's death, the proceeds of the $125,000 of insurance on his life remaining after payment of the loan from SBA should be paid to his estate. The proceeds of the remaining $75,000 of insurance on Solar's life, held in the trust but not assigned to SBA, were to be paid to Solar's estate upon his death, and his 250 shares of stock were to be transferred to Liberty. In addition his widow would receive a pension in the total amount of $20,800.

The somewhat reciprocal provisions which were made in the amendment as to Ashe greatly reduced the payments which were to be made to his estate for his stock. The $195,000 of insurance on his life remaining after the assignment

---

1. The district court found, seemingly with warrant, that the valuation of the stock was an arbitrary figure which far exceeded its actual value. In the absence of sufficient insurance, interesting questions as to the rights of creditors might be presented. See Winchell v. Plywood Corp., 1949, 324 Mass. 171, 85 N.E.2d 313.

2. In the present action the assignee, as counsel for Liberty, has filed a statement

of cash on hand. The creditors have received no other representation. Since we find Liberty not liable, we need not consider how they would be affected by a judgment against it, cf. Provident Tradesmens Bank & Trust Co. v. Patterson, 1968, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed. 2d 936, or whether the case against it should have been dismissed or remanded, see United Mine Workers of America v. Gibbs, 1966, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218; cf. 28 U.S.C. § 1441(c).

of $125,000 face amount to SBA, was sold to Ashe outright for its cash surrender value, Liberty assuming no obligation to pay the premiums. As with Solar, nothing more was said about the percentage of profits. Furthermore, the provision in the 1960 agreement that if the price to be paid either estate for its stock exceeded the available insurance, Liberty would pay from its treasury, finds no counterpart in the amendment.

The basic question, upon which plaintiffs' other contentions depend, is what price, under the amendment, Ashe's estate was entitled to receive for his stock. Plaintiffs concede that it was no longer the $320,000 provided in the 1960 agreement, but say that "the purchase price in the amendment was equated to the remaining principal amount of the insurance owned by Liberty, $125,000, plus the transfer to Ashe for the cash surrender value of the balance of the insurance on his life, $195,000, and a $200 weekly pension to Ashe's widow for up to 104 weeks." Hence, by silence, they agree that the 1960 provisions with respect to net profits do not hold over; in other words, that so far as price is concerned, the 1962 amendment is the sole document. We agree that this must be so.

We also agree that the clause quoted from plaintiffs' brief correctly states the price provided, but we do not construe plaintiffs' words as they do. By "remaining principal amount of insurance," they mean remaining of the original $320,000; namely, that Liberty owes $125,000 whether the proceeds of the insurance are available to pay it or not. We say, rather, with the district court, that the amendment provides, expressly and solely, that Ashe's estate is to receive "the proceeds of the said policies remaining after the payment of the loan. * * *"

Not only is there no express undertaking that Liberty is to make up any balance, we find no room to imply one. In the first place, if Liberty was intended to pay $125,000 for the stock regardless of what should remain out of the insurance assigned to SBA, the whole concept of the procedure was violated. The purpose of the trust was to fund Liberty's obligation with insurance. Having temporarily placed this insurance where it might be otherwise consumed,[3] if Liberty was intended to retain a flat obligation to pay $125,000 during this interim, it would have been natural to retain $125,000 of freely available insurance to meet the payment. Instead, it surrendered that amount of insurance, and more, to Ashe for its cash value.

Furthermore, if we are to go outside the instrument at all, the first place to go would be to the agreement which it amended. The 1960 agreement provided that if the insurance was insufficient to pay the then undertaken price obligation, Liberty itself was to pay. This gives special significance to the lack of any such affirmative undertaking by Liberty in the amendment. Likewise absent from the amendment was the prior provision covering a situation where it would be illegal for Liberty to make payments supplementing the insurance. If it was contemplated under the amendment that Liberty was to make a substantial payment beyond what was covered by the insurance, it was particularly inappropriate to omit this savings clause when Liberty was in a financial condition that warranted an SBA loan. We would be slow to think not only that the parties did not appreciate the difficulties in permitting stockholders to compete with creditors against general funds,[4] but that SBA, whose lending was affected with a public interest, would intend that such a possibility could arise at a time when it was actively providing assistance. See 15 U.S.C. §§ 631, 636(a).

---

3. This was not improbable, since the district court correctly held that SBA was authorized to apply insurance proceeds to the loan whether or not Liberty was behind in its payments. 271 F.Supp. at 102–103.

4. See fn. 1, supra.

**370**

It is not inappropriate to note that plaintiffs are presently claiming priority over all other creditors. If it were permissible to draw inferences—which we think it is not—rather than that the agreement promised Ashe's executors more than it appeared to on its face, we would infer that the omissions from the 1960 agreement were deliberately intended in order to avoid just the claim which is now being presented.

If, of course, plaintiffs have no claim, their assertion that they were subrogated to SBA's claim when SBA was paid is without foundation. Basic to their position is that the insurance policies were collateral to secure Liberty's independent obligation to them. Since we rule that it had none, and owed only whatever proceeds remained of the insurance, plaintiffs' premise fails.

Affirmed.