George RENBERG, Donald Renberg, Robert Renberg, and Sherrie Renberg Kaplan, Co-Trustees of the Dorothy Zarrow Renberg Revocable Trust dated October 1, 1977, Appellants,

v.

Henry ZARROW, Jack Zarrow, and Rose Zarrow, Appellees.

No. 55971.

Supreme Court of Oklahoma.

March 8, 1983.

Rehearing Denied July 19, 1983.

Pray, Walker, Jackman, Williamson & Marlar by Floyd L. Walker, Tulsa, and Vihon, Fuchs, Temple & Berman, Ltd. by Robert F. Fuchs, Chicago, Ill., for appellants.

Royce H. Savage, William C. Anderson, James M. Sturdivant and Oliver S. Howard, Tulsa, for appellees.

HODGES, Justice.

This appeal involves the implementation of a buy-sell stock agreement which was executed in 1963, by Sam, Rose, Jack and Henry Zarrow and Dorothy Zarrow Renberg, the owners of the stock in Sooner Pipe & Supply Corporation (Sooner). Henry, Jack and Dorothy are the children of Sam and Rose Zarrow.

Sooner was established in the mid-1930's by Henry as a one-man business. A few years later, Henry persuaded Sam to close his grocery store and join him at Sooner. Henry gave his father 50% of the business and made him Chairman of the corporation. Over the years, gifts of stock were made to Dorothy from her parents, Sam and Rose.

On February 22, 1957, the Sooner shareholders signed a buy-sell agreement which provided that Sooner had the option to purchase the shares of a deceased shareholder at book value. During 1963, the shareholders conferred with various experts about possible adverse income tax consequences which might result in the event of the deaths of Sam or Rose Zarrow. They were advised that the purchase by Sooner of the shares from the estate of Sam or Rose could result in adverse income tax consequences, and it was recommended that the 1957 Agreement be cancelled. On September 3, 1963, the Sooner shareholders cancelled the 1957 Agreement and executed the Stock Purchase Agreement which is the subject of this litigation.[1] Under the terms of the 1963 Agreement, upon the death of any shareholder, the survivors had an option, to be exercised within one year of the date of death, to buy the decedent's shares at a price set by the majority shareholders each year; and if no price was set in any year the most recent price prevailed.[2]

When the shares were re-evaluated in 1975, Dorothy was told by the Sooner's corporate lawyer that the book value was between $9,000 and $10,000 per share; and he offered to make any other financial information she desired available to her. The Sooner bylaws provide that a special shareholders' meeting can be called by any two shareholders. After October 30, 1975, Dorothy was a dual shareholder; both individually, and as executor for Sam Zarrow. Dorothy never asked for a special meeting to revalue the stock although she was aware that Sooner continued to prosper.

1. The buy-sell agreement provides in pertinent part:
 "The value of a share of stock of the Corporation for the purpose of computing the purchase price under paragraph II is hereby fixed by the STOCKHOLDERS and agreed to be $270.00 per share. Hereafter, within ninety days after the close of each fiscal year of the CORPORATION, the value of each share of stock shall be fixed by resolution passed at a duly called meeting of the STOCKHOLDERS by a majority vote of the stock voted at such meeting. The resolution to be adopted shall be in the following form:
 'The value of each share of stock of the CORPORATION for the purpose of the STOCK PURCHASE AGREEMENT dated September 3rd, 1963, shall be $_____, until and unless changed in accordance with the terms of the STOCK PURCHASE AGREEMENT.'
 It is agreed that the value of the stock is and shall be based upon consideration of all tangible and intangible assets, including good will, and all other factors relating to the value of the stock. It is further understood and agreed that the TRUSTEE shall attach to its copy of this STOCK PURCHASE AGREEMENT, the resolutions setting forth the succeeding stock values.

 "If the STOCKHOLDERS fail for any reason to pass a resolution as above provided fixing the value of the stock, the last valuation under the provisions of this STOCK PURCHASE AGREEMENT shall constitute the value of the stock until a subsequent resolution is passed in accordance with the terms of this stock purchase agreement."

2. The Sooner shareholders set or revised the option price under the 1963 Agreement as follows:

| Date of Revision | Option Price Per Share | Total Shares Outstanding |
|---|---|---|
| September 3, 1963 | $ 270.00 | 2,000 |
| October 14, 1966 | 500.00 | 2,000 |
| February 3, 1969 | 300.00 | 7,000 |
| August 2, 1971 | 300.00 | 7,000 |
| March 14, 1974 | 500.00 | 7,000 |
| June 27, 1975 | 3,500.00 | 7,000 |

In each instance, the revaluation of the option price was evidenced by corporate minutes, signed by the corporate secretary, which were accompanied by a waiver of notice signed by all Sooner shareholders.

On October 6, 1975, Sam Zarrow died. Dorothy and Bank of Oklahoma were named co-executors on October 30, 1975. Robert Milsten, Dorothy's personal attorney, was employed to probate the estate and to handle the estate tax matters. During the various meetings he attended in connection with Sam's estate, Milsten examined the audited financial statements of Sooner which reflect the after tax earnings of $6,000 per share for the year ended July 31, 1975. The Co-executors decided to keep the value of Sooner as low as possible in order to minimize estate taxes.[3] On January 6, 1977, Dorothy and the Bank of Oklahoma signed and filed the federal estate tax return in Sam Zarrow's estate, prepared by Milsten and his firm, which reported the Sooner shares to have a fair market value on October 6, 1975, of $2,250 each. In August, 1976 and 1977, the annual shareholders' meetings of Sooner were held. All shareholders, including Dorothy, signed a waiver of notice. No action was taken concerning revision of the option price.

In April of 1977, Dorothy became ill and surgery for cancer was performed at the Mayo Clinic. When she returned to the Mayo Clinic on October 11, 1977, for additional surgery, she was told that she was terminally ill with a life expectancy of six months. At that time, at her request, Henry and Dorothy discussed her personal estate plan. Dorothy asked Henry to have Sooner's financial vice-president prepare a summary showing what the federal estate taxes would be in Dorothy's estate, assuming a value of $3,500 per share for Sooner,

if she excluded her husband from her estate. It was recommended to Dorothy that she not exclude George from the provisions in her Will in order to maximize the marital deduction. After the meeting with Henry, Dorothy amended her revocable trust. She left her husband a portion of her estate in a spendthrift trust with her three children named as trustees for George during his lifetime. Dorothy died on April 22, 1978, without ever complaining about the option price or requesting that it be changed.

On August 7, 1978, the annual stockholders' meeting of Sooner was held. Although notice was given to George, as successor trustee of Dorothy's trust, he did not attend. No action was taken at this meeting concerning the option price; and George proposed no changes either in person or by proxy.

In early 1979, the IRS determined that the fair market value of Sam's Sooner shares on October 6, 1975 was $3,250. On Thursday, April 19, 1979, Henry, Jack, and Rose notified the Renbergs and First National Bank & Trust Company of Tulsa of their election to exercise their option to purchase Dorothy's shares. The Zarrows tendered: promissory notes totalling $3,538,031.73; cash in the amount of $353,803.18 to pay the first installment; and checks for one year's interest in the amount of $141,521.27. The Renbergs notified First National on April 20, 1979 that: the Agreement was void and unenforceable; the Zarrows had no legal right to purchase Dorothy's stock; and demanded that the cash

---

**3.** Milsten, in an effort to minimize the gift taxes Dorothy would have to pay under the "net gift" agreement, wrote the Oklahoma Tax Commission that the value for the Sooner shares reported in the gift tax returns was

"... the amount that all of the stockholders of the corporation agreed upon as the value, under a binding Stock Purchase Agreement, which has long been in existence. It is controlling in this situation.... Thus, this gift of a very minor amount (5%) of this closely-held, non-marketable stock, was based on the value agreed to in a written, long-standing, arms-length negotiated buy-sell agreement between all of the stockholders of this corporation. This agreement which has been in effect since 1963, and has been consistently

followed, enforced, and is controlling, places a ceiling or limit on the value of this corporate stock. Under the agreements, these shares are restricted and cannot be sold, pledged, used as collateral, or in any other way transferred or negotiated. They cannot be dealt with or disposed of except as limited in the Agreement, and hence, have no market value because of the prior and superior rights of the other shareholders and corporation, under the Stock Purchase Agreement ... "In view of the binding, written Stock Purchase Agreement of valuation, we believe that the financial statements of the corporation are not relevant and will not be needed by you in making such valuations."

and notes be returned to the Zarrows, and that the shares be retained by the Renbergs.

On May 30, 1979, George Renberg commenced this action. On May 31, 1979, a hearing was held on an application by the Renbergs to prevent transfer of the shares. An order, approved by all counsel, was entered which found that the proposed transfer of the shares of corporate stock previously owned by Dorothy should be completed on May 31, 1979. On July 10, 1979, plaintiffs filed their First Amended Petition which sought money damages.

When the $3,500 per share price was adopted June 27, 1975, Sooner's internal financial statements projected that 1975 earnings after adjustment would result in a book value of $9,885 per share. The Renbergs allege that the book value adjusted for LIFO reserves was $17,535 per share with a market value of $23,100 per share. It is asserted that on May 31, 1979, the date the shares were purchased by Sooner, the market value was $31,300 per share. On July 23, 1979, George Renberg, as successor trustee of the Dorothy Renberg trust, filed a federal estate tax return. He reported $2,189 as the fair market value of Dorothy's Sooner shares on April 22, 1978.

The trial court found that the 1963 Agreement and its amendments: 1) imposed no fiduciary duty on any party; 2) were supported by valid consideration and were fairly and validly negotiated at arms-length in utmost good faith without fraud, over-reaching, misrepresentation, or failure to disclose any pertinent information to any of the shareholders; 3) failure to reprice the shares on an annual basis did not constitute a breach of the contract, and the last price determined was the prevailing price at the time of Dorothy's death; 4) the 1963 Agreement imposed solely contractual duties on the parties, and the exercise of the option to purchase did not constitute unjust enrichment or conversion; 5) Dorothy enjoyed the benefits of the Agreement

for more than fourteen years and affirmatively used the Agreement for her personal financial benefit; 6) the knowledge of Dorothy's attorney concerning the actual value of the stock was imputed to her; and 7) the failure of George Renberg to attend the annual shareholders' meeting constituted a waiver of his claim that the option price should have been elevated.

The Renbergs assert on appeal that: 1) the court's interpretation of the 1963 stock agreement was clearly erroneous as a matter of law; 2) a fiduciary relationship exists between shareholders of a closely held family corporation who deal with one another in connection with the purchase or sale of shares in the corporation; 3) an action for unjust enrichment is proper if there is a breach of fiduciary duty and the burden is on one having a fiduciary obligation to prove that the challenged transaction is fair; 4) the trial court erred in holding that appellees had exercised utmost good faith.

I

Absolute restrictions forbidding the alienation of corporate stock are invalid, but reasonable restrictions are not.[4] The usual purpose of shareholders' agreements which restrict the sale of corporate stock is to prevent transfers to outsiders without first providing an opportunity for the shareholders to acquire the stock. The agreement evolved as a device to assure the succession in interest of persons most likely to act in harmony with the other stockholders. Stock in a corporation creates a personal relationship analogous to a partnership, and shareholders in a close corporation should have the same right to choose one's associates in a corporation as in a firm.[5] Restrictive agreements designed to prevent sale of stock to outsiders must be strictly construed and cannot be applied to transactions which are not expressly mentioned in

---

4. See *Schonwald v. Cassell,* 475 P.2d 612, 614 (1970).

5. *Barrett v. King,* 181 Mass. 476, 63 N.E. 934, 935 (1902).

the agreement; nor can they be enlarged by implication.[6]

A basic reason for buy-sell agreements is to provide methodology to determine the value of the stock.[7] The difficulty of determining the price to be paid arises because shares of a close corporation are not traded on the open market and, therefore, the value cannot be readily ascertained.[8] To induce shareholders to purchase decedents' shares and to provide a market for the stock, the price must be attractive. A great deal of leeway is permitted because the shares represent more than a mere interest in property.[9]

The Sooner shareholders considered several factors other than income tax implications in the periodic revaluation of the option price. These included: the ability of the surviving shareholders to pay the purchase price; maintenance of the option price at a level which would be attractive enough to the survivors to exercise their options; and provision of a market for the shares.

■ Buy-sell agreements are construed to comply with the manifest intent of the parties.[10] After parties in a close corporation agree on a price formula, the validity of the restriction on transfer does not rest on any abstract notion of intrinsic fairness of price. Before the restriction can be declared invalid, it must be shown that there is more than a mere disparity between option price and current market value.[11] In the absence of fraud, overreaching, or bad faith, an agreement between the stockholders that upon the death of any of them, the stock may be acquired by the corporation is binding.[12] Even a great disparity between the price specified in a buy-sell agreement and the actual value of the stock is not sufficient to invalidate the agreement.[13] Although this agreement inured to the benefit of the Zarrows, it might very well have resulted in benefit to Dorothy had she survived.[14] Under the actuarial tables in effect at the time of the 1963 Agreement, Dorothy stood to gain most by the agreement;[15] she was consistently advised of the value of the stock; she and her attorney had access to Sooner's financial records;[16] and could have called a shareholders' meeting to reassess the stock had she so desired. The agreement benefited Dorothy as the beneficiary and co-executor of Sam's estate.

**6.** United States v. Adkins-Phelps, Inc., 400 F.2d 737, 741 (8th Cir.1968); Dobry v. Dobry, 262 P.2d 691, 693 (Okla.1953); Guaranty Laundry Co. v. Pulliam, 198 Okl. 667, 181 P.2d 1007, 1008, 2 A.L.R.2d 738 (1947).

**7.** Horne v. Drachman, 247 Ga. 802, 280 S.E.2d 338, 341 (1981); Reliance Drug Co. v. Finke, 39 App.Div.2d 580, 332 N.Y.S.2d 147 (1972).

**8.** Schmidt v. Chambers, 265 Md. 9, 288 A.2d 356, 369 (1972).

**9.** Krebs v. McDonald's Ex'x., 266 S.W.2d 87, 89 (Ky.1953); Lewis v. Powell, 203 So.2d 504, 506 (Fla.App.1967).

**10.** Godine v. Liberty Shoe Co., 396 F.2d 366, 370 (1st Cir.1968); Vogel v. Melish, 31 Ill.2d 620, 203 N.E.2d 411, 413 (1965); Galler v. Galler, 32 Ill.2d 16, 203 N.E.2d 577 (1965).

**11.** Allen v. Biltmore Tissue Corp., 2 N.Y.2d 534, 161 N.Y.S.2d 418, 422, 141 N.E.2d 812, 816, 61 A.L.R.2d 1309 (1957); see also Ginter v. Palmer & Co., 39 Colo.App. 221, 566 P.2d 1358, 1360 (Colo.App.1977).

**12.** Krauss v. Kuechler, 300 Mass. 346, 15 N.E.2d 207, 208, 117 A.L.R. 1355 (1938).

**13.** In Re Mather's Estate, 410 Pa. 361, 189 A.2d 586, 592 (1963); Martin v. Graybar Elec. Co., 285 F.2d 619, 625 (6th Cir.1961).

**14.** See Matter of Estate of Dillon, 575 P.2d 127, 132–33 (Okl.1978); In re Borchard Estate, 74 Misc.2d 376, 346 N.Y.S.2d 620, 622 (1973). See also Annot., "Validity of Restriction On Alienation Or Transfer Of Corporate Stock," 61 A.L. R.2d 1318 (1958).

**15.** When the 1963 Agreement was executed, the life expectancy of the respective parties, according to the 1958 Mortality Tables was:

| Name of Shareholder | Expected Year of Death |
| --- | --- |
| Sam Zarrow | 1972 |
| Rose Zarrow | 1976 |
| Henry Zarrow | 1988 |
| Jack Zarrow | 1996 |
| Dorothy Zarrow Renberg | 1997 |

**16.** In the absence of fraud, notice or knowledge of attorney acquired during scope of employment is imputed to the client. Pyeatt v. Estus, 72 Okl. 160, 179 P. 42, 46, 4 A.L.R. 1570 (1919); Eaton v. State, 418 P.2d 710, 714 (Okl.Crim. 1966).

Generally, the surviving spouse cannot complain that a buy-sell agreement failed to accurately reflect actual value of stock through years of operation if the deceased shareholder profited from the agreement.[17] If the value of stock is determined pursuant to method provided in stockholders' agreement, the stockholder,[18] the heirs,[19] and the personal representative of the deceased shareholder are bound by its terms.[20] An executor's title to corporate stock in an estate is acquired by operation of law, and further transfer of the stock either to specific legatees or to others is subject to transfer restrictions imposed by stockholders' agreement.[21] Further, to contest the validity of a contract, a person must have been either a third party beneficiary or a party to the agreement.[22] George was neither.

 Where, as here, a document is unambiguous and the intent of its drafters is clear, its interpretation is a matter of law, not fact. The language of a written contract governs the rights and obligations of the contracting parties.[23] The courts may not rewrite a shareholders' agreement under the guise of relieving one of the parties from the apparent hardship of an improvident bargain;[24] nor may the courts rewrite an agreement which is clear and unambiguous on its face.[25] We agree with the trial court's finding that the stipulated price provision wherein no one knows for certain at the time the price is set whether he is to be a buyer or a seller is inherently fair and provides mutuality of risk. We find that: the enforceable agreement was entered into as the result of an arms-length transaction; the agreement encompassed all the terms agreed by the parties; and that the trial court did not err in its interpretation of the 1963 Purchase Agreement.

## II

 A court of equity will not enforce stock transfer restrictions adopted under circumstances which indicate bad faith and inequitable treatment of stock purchasers.[26] Because close corporations are usually family affairs, a special relationship may exist between the majority shareholder of a close corporation and a minority shareholder. If a fiduciary relationship exists, and circumstances result in the enhancement of the value of the stock which are known to the officers, directors or the majority shareholders because of their position in the corporation, but which are unknown to the minority, the officers, directors, or the majority shareholders are required to make a full disclosure to the minority. Failure to do so may amount to fraud or deceit sufficient to vitiate a sale, and entitle the minority to relief for unjust enrichment.[27]

17. *Krebs v. McDonald's Ex'x.,* see note 9, supra.

18. *Lewis v. Powell,* note 9, supra.

19. *Hodges v. Pittman,* Ala., 384 So.2d 14, 16 (1980); *In Re Borchard Estate,* see note 14, supra.

20. *Covey v. Covey's Little America, Inc.,* 378 P.2d 506 (Wyo.1963).

21. *Colbert v. Hennessey,* 351 Mass. 131, 217 N.E.2d 914 (1966).

22. See also 12 Fletcher, Cyclopedia of the Law of Private Corporations, pp. 191–243 §§ 5461.1 —5461.10 (1971); pp. 7–24 §§ 5461.1—5461.10 (1982 Supp.)

23. *Meeks v. Harmon,* 207 Okl. 459, 250 P.2d 203 (1952).

24. *Simpson v. Young,* 369 So.2d 376, 377 (Fla. App.1979).

25. *Fiore v. Fiore,* 46 N.Y.2d 971, 415 N.Y.S.2d 826, 389 N.E.2d 138, 139 (1979).

26. *Bloodworth v. Sandersville Production Credit Ass'n.,* 245 Ga. 40, 262 S.E.2d 804, 806 (1980).

27. If a confidential relationship exists between parties, failure to disclose all material facts has the effect of a material misrepresentation. In *Daniel v. Tolon,* 53 Okl. 666, 157 P. 756, 758, 4 A.L.R. 704 (1916) we said:
 " * * * The broad principle on which the court acts in cases of this description is that wherever there exists such a confidence, of whatever character that confidence may be, as enables the person in whom confidence or trust is reposed to exert influence over the person trusting him, the court will not allow

The relationship of brother and sister does not of itself create a fiduciary relationship between the parties.[28] However, a majority shareholder has a fiduciary duty not to misuse his power by promoting his personal interests at the expense of the corporation, and the majority shareholder has the duty to protect the interests of the minority.[29] Unless minority shareholders have been systematically excluded from directors and shareholders' meetings, minority stockholders in a close corporation usually have access, apart from the corporate records, to inside information which may affect the value of the stock.[30] It has been held that absent circumstances from which fraud or unfair dealing may be inferred, an officer or director of a close corporation has no duty to volunteer information to a stockholder from whom he purchases stock.[31]

There is no evidence that there was fraud or overreaching in connection with the buy-sell agreement. It operated equally concerning all shareholders. The fact that surviving shareholders were allowed to purchase Dorothy's shares on stated terms and conditions which resulted in purchase for less than actual value of the stock does not subject the agreement to attack as a breach of the relation of trust and confidence.[32] There was no fiduciary duty imposed on the Zarrows, and even if there had been, Dorothy was not only fully aware of the actual value of the stock, but could have called a meeting to reassess its value had she so desired.

### III

Based on the foregoing analysis, we find that there was no duty on the Zarrows to

prove that the challenged transaction was fair and that trial court's imposition of the burden of proof on the Renbergs to prove the unfairness of the transaction is irrelevant because the long standing agreement was negotiated at arms-length; was used by Dorothy to her benefit; encompassed the agreement of the parties; and was reaffirmed by Dorothy on six occasions.

AFFIRMED.

All the Justices concur.

---

any transaction between the parties to stand, unless there has been the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish a contract with the person so trusting him."
See also *Jaynes v. Jaynes,* 98 Cal.App.2d 447, 220 P.2d 598 (1950).

**28.** *Sellers v. Sellers,* 428 P.2d 230, 237 (Okl. 1967); *Wadsworth v. Courtney,* 393 P.2d 530, 533 (Okl.1964).

**29.** *United States v. Byrum,* 408 U.S. 125, 92 S.Ct. 2382, 33 L.Ed.2d 238 (1972); *Pepper v.*

*Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

**30.** Annot., "Duty And Liability Of Closely Held Corporation, Its Directors, Officers, Or Majority Shareholders, In Acquiring Stock Of Minority Shareholder," 7 A.L.R.3d 500, 502 (1966).

**31.** *Clayton v. James B. Clou & Sons,* 327 F.2d 382 (7th Cir.1964); *Kohler v. Kohler Co.,* 319 F.2d 634 (7th Cir.1963).

**32.** *Graham v. Stratton,* 339 F.2d 1004, 1008 (7th Cir.1964).