2010 OK 16

OKLAHOMA DEPARTMENT OF SECU-
RITIES ex rel. Irving L. FAUGHT, Ad-
ministrator, and Douglas L. Jackson, in
his capacity as the court appointed re-
ceiver for the investors and creditors of
Schubert & Assoc. and for the assets of
Marsha Schubert, individually, and do-
ing business as Schubert & Associates,
and for Schubert & Associates, Plain-
tiffs/Appellees,

v.

R. Kurt BLAIR, Wendy B. Blair, Neil
Sheehan, and Robert Rains,
Defendants/Appellants,

v.

Robert W. Matthews, et al., Defendants.

Oklahoma Department of Securities ex rel.
Irving L. Faught, Administrator, and
Douglas L. Jackson, in his capacity as
the court appointed receiver for the in-
vestors and creditors of Schubert & As-
sociates. and for the assets of Marsha
Schubert, individually, and doing busi-
ness as Schubert & Associates, and for
Schubert & Associates, Plaintiffs/Appel-
lees,

v.

Kenneth Young, Leslie Young, K.R. Larue,
Dana Larue, Scott Wilcox, Rodney Mar-
tin, Wanda Martin, Raymond Laubach,
Dan Jackson and Crystal Jackson, De-
fendants/Appellants,

v.

Robert W. Matthews, et al., Defendants.

Oklahoma Department of Securities ex rel.
Irving L. Faught, Administrator, and
Douglas L. Jackson, in his capacity as
the court appointed receiver for the in-
vestors and creditors of Schubert & As-
sociates, and for the assets of Marsha
Schubert, individually, and doing busi-
ness as Schubert & Associates, and for
Schubert & Associates, Plaintiffs/Appel-
lees,

v.

Kenneth Larue, Arthur Platt, Yvonne
Platt, Marvin Wilcox, and Pamela
Wilcox, Defendants/Appellants,

v.

Robert W. Matthews, et al., Defendants.

Oklahoma Department of Securities ex
rel. Irving L. Faught, Administrator,
Plaintiff/Respondent,

v.

Barry Pollard and Roxanne Pollard,
Defendants/Petitioners.

Nos. 104,004, 104,161, 104,262, 105,682.

Supreme Court of Oklahoma.

Feb. 23, 2010.

As Corrected April 6, 2010.

Rehearing Denied April 12, 2010.

G. David Bryant and Lisa Wilcox, Kline, Kline, Elliott & Bryant, P.C., Oklahoma City, OK, for Appellants in Nos. 104,004; 104,161; and 104,262 (Consolidated with No. 104,304).

Melanie Hall, Gerri Kavanaugh, and Amanda Cornmesser, Oklahoma City, OK, for Appellee Oklahoma Department of Securities in Nos. 104,004; 104,161; and 104,262 (Consolidated with No. 104,304).

Bradley E. Davenport, Gungoll, Jackson, Collins, Box, & Devoll, P.C., Enid, OK, for Appellee, Douglas L. Jackson, Receiver, in Nos. 104,004; 104,161; and 104,262 (Consolidated with No. 104,304).

Russell L. Mulinix, Amy G. Piedmont, Mulinix, Ogden, Hall, Andrews & Ludlam, P.L.L.C., Oklahoma City, OK, for Petitioners in No. 105,682.

Melanie Hall, Gerri Kavanaugh, and Amanda Cornmesser, Oklahoma City, OK, for Respondent, Oklahoma Department of Securities in No. 105,682.

EDMONDSON, C.J.

¶ 1 The first-impression principal issue in these appellate proceedings is whether an action may be maintained under the Oklahoma Uniform Securities Act against innocent victims of a Ponzi scheme to force them to pay to the Department of Securities those amounts they received from the Ponzi scheme which are in excess of their investments in that scheme. We hold that the Department may proceed against the innocent investors to recover *unreasonable* profits received in excess of their investments in the Ponzi scheme. We hold that a court-appointed receiver of a Ponzi-scheme operator may also proceed against innocent investors to recover *unreasonable* profits in excess of their investments in the scheme. We also hold that the Department's action is subject to equitable setoffs raised in defense by the innocent investors. We consolidate the proceedings for the sole purpose of a single pronouncement from this Court on the issues.[1]

---

1. The assignments of error in appeal Nos. 104,004, 104,161, and 104,262 consolidated with 104,304, challenge summary judgments granted in the same action in the District Court for Oklahoma County, Cause No. CJ–2005–3796 (consolidated with CJ–2005–3299). Appeal No. 105,682 is an appeal of a certified interlocutory order issued in Oklahoma County District Court Cause No. CJ–2005–3799. Contemporaneous appeals of orders or judgments in the same district court proceeding may be consolidated into one appeal with one record on appeal. 12 O.S. 2001 Ch. 15, App. 1, Okla. Sup.Ct. R. 1.27(c) & (d). We decline to consolidate these appeals for any purpose other than adjudication by a single opinion because the separate records have already been filed in these appeals, No. 105,682 involves a trial court action not consolidated in the trial court with the other trial court action.

Appellant, Wade Toepfer, moved to voluntarily dismiss his appeal in No. 104,004 while the matter was pending before this Court. The motion is

## I. The Facts of the Controversy

¶ 2 Marsha Schubert, as a registered agent of registered investment broker-dealers, Schubert's business, Schubert and Associates, received over two hundred million dollars during the period of December 1999 to October 2004 to invest for other people.[2] She made verbal statements to investors that their money would be used to make trades in alleged options accounts and day trading accounts, and that their accounts with the broker-dealers held large balances.

¶ 3 Schubert deposited the funds into various personal bank accounts she controlled as well as her business bank account, in the name of Schubert & Associates. She also deposited some funds she received into brokerage accounts for the investors. For example, money received by Defendants, the Youngs, was split into deposits for the Youngs' brokerage account and the Schubert and Associates bank account. The investment monies deposited into the Schubert & Associate account and Schubert's various personal bank accounts were never directly used to make any investment trades through the broker-dealers on behalf of the investors, although Schubert continually made statements to the contrary to her investors. The money she received for option contracts or day trading, she appropriated as part of a Ponzi scheme. The majority of these funds were eventually deposited into personal accounts of Schubert where they were commingled with Schubert's personal funds.[3]

¶ 4 Schubert kept her Ponzi scheme from discovery by making payments to some of her investors. She paid them with checks drawn on her Schubert & Associates bank account, another bank account listing her name with a tax permit number, as well as payments by wire transfers from her bank accounts directly into the investors' broker-dealer accounts. Investors would receive statements from their broker-dealers showing funds in their accounts.

¶ 5 After discovery of the Ponzi scheme the Oklahoma Department of Securities (Department) brought an action in the District Court for Logan County against Schubert and sought injunctive relief and appointment of a receiver for her and her business, Schubert and Associates. The trial court appointed a receiver and by a subsequent order directed that Receiver, Douglas L. Jackson, also serve as "receiver for the benefit of claimants and creditors of Marsh Schubert and Schubert and Associates." The order authorized the receiver to "institute actions ... Against paid investors ... that the Receiver deems necessary to recover assets and to protect the interests of and promote equity among the investors." The order defined "assets" as including the "proceeds of the investment program described in the Petition (i.e., the Schubert Investment Program) by which certain participants were unjustly enriched or received fraudulent transfers."

¶ 6 In May of 2005 the receiver and the Department brought a joint action in the District Court for Oklahoma County and named one-hundred and fifty-eight defendants. Approximately eighty-seven people allegedly lost in excess of nine million dollars, and over one-hundred and fifty people allegedly made approximately six million dollars from Schubert.[4] The record *appears* to indicate that the 158 investors were paid with Schubert and Associates funds received from other investors. The defendants were not charged with securities violations.

granted and Toepfer's name has been removed from the list of appellants in the style. Appellant, Sheryl Mercer, moved to dismiss her appeal in No. 104,161 while the matter was pending before this Court. No motion contesting the dismissal has been filed. The motion is granted and Mercer's name has been removed from the list of appellants in the style.

2. No. 105, 682, O.R. at 124, 125, Tab "D", Plaintiff's Motion for Summary Judgment, March 29, 2007, Affidavit of D. C., Supervisory Investigator for Department of Securities.

3. No. 105, 682, O.R. at 124, 125, Tab "D", Plaintiff's Motion for Summary Judgment, March 29, 2007, Affidavit of D. C., Supervisory Investigator for Department of Securities.

4. No. 105, 682, O.R. at 124, 125, Tab "D", Plaintiff's Motion for Summary Judgment, March 29, 2007, Affidavit of D. C., Supervisory Investigator for Department of Securities.

¶ 7 The Petition asserted claims against the defendants on grounds of unjust enrichment, fraudulent transfer and an equitable lien "against all real property and personal property purchased with unearned investor assets" received by the defendants. The Petitioners later withdrew their claim of fraudulent transfers. The Receiver and Department then proceeded to obtain summary judgments solely on the unjust enrichment theory and the trial court granted judgment against the defendants based upon this theory. Several of the defendants appealed. We issue one opinion for the multiple appeals.

## II. District Court Jurisdiction in Actions by the Oklahoma Department of Securities Against Innocent Investors

¶ 8 The first issue presented is whether the District Court has jurisdiction in an action seeking equity/restitution brought by the Administrator and/or the Department against innocent investors in a securities fraud scheme when the investors received more money from their investment than they invested in the scheme. At one point in the trial court the Administrator/Department summarized its legal basis for actions against Defendants in a District Court.

It is true that the text of the Act [Oklahoma Uniform Securities Act of 2004] and the Predecessor Act [Oklahoma Securities Act, 2001 as amended thru 2003] do not specifically address the ability to recover from relief defendants [the 158 defendants whom allegedly made a Ponzi profit], nor have the Oklahoma courts addressed this issue. However, Section 1–602(B) [1–603(B) ] of the Act and Section 406.1 of the Predecessor Act clearly confer equitable jurisdiction upon the district courts when securities law violations occur. The Act

and Predecessor Act also explicitly reference the important objective of promoting "greater uniformity in securities matters" among the state and federal government. In acknowledgment of the goal of uniformity, the Oklahoma Supreme Court has stated that the interpretative history of the federal securities acts, upon which Oklahoma's securities laws are modeled, is properly considered in the interpretation of similar state securities provisions. *Day,* at ¶ 30–31, [*State ex rel. Day v. Southwest Mineral Energy, Inc.,* 1980 OK 118, 617 P.2d 1334]. More specifically, the Oklahoma Supreme Court found that the Oklahoma Legislature intended equitable remedies be available to the Administrator for enforcement under the Oklahoma securities laws and that the Administrator has the power to seek such remedial relief. *Day* at ¶ 18–21.

Department's response to a motion to dismiss in the trial court.[5]

The Departments' arguments may be further summarized as (1) an action against Ponzi defendants is authorized by § 1–603(B);[6] (2) the Administrator has authority to seek this particular equitable relief based upon the Court's opinion in *State ex rel. Day v. Southwest Mineral Energy, Inc.,* 1980 OK 118, 617 P.2d 1334; (3) an action against Ponzi defendants promotes uniformity among the states and the federal government in securities matters; and (4) the interpretive history of federal securities acts is consistent with an action against Ponzi defendants.

■ ¶ 9 The Oklahoma Securities Commission and the Oklahoma Department of Securities are created by statute, with the Commission as the policy-making and governing authority of the Department. 71 O.S. Supp. 2003 § 1–601(B).[7] The Oklahoma Depart-

---

5. No. 104,161, O.R. Vol. 1, Tab 7, pg. 4, "Plaintiff Oklahoma Department of Securities' Response to Defendants' Supplemental Brief to Motion to Dismiss," No. CJ–2005–3299, consolidated with CJ–2005–3796, filed Aug. 8, 2005, (explanatory phrases and citation added to original).

6. The quote from the Department's filing cites 71 O.S. Supp.2003 § 1–602(B) and former 71 O.S. 2001 § 406.1. Former § 406.1 is codified in an amended form at 71 O.S. Supp.2003 § 1–603.

Section 1–602(B) involves production of records and other procedures not relevant to the controversy before us. The Department's other filings clearly indicate that it relies upon § 1–603(B) and not § 1–602(B).

7. 71 O.S. Supp.2003 § 1–601(B), states that "There are hereby created the Oklahoma Securities Commission and the Department of Securities. The Commission shall be the policy making and governing authority of the Department, shall

ment of Securities (or Department), as a public agency, possesses those powers expressly granted by law, by constitution or statute, *and such powers as are necessary for the due and efficient exercise of the powers expressly granted,* or such as may be fairly implied from the constitutional provision or statute granting the express powers. *Oklahoma Public Employees Ass'n v. Oklahoma Dept. of Central Services,* 2002 OK 71, ¶¶ 25–27, 55 P.3d 1072, 1083–1084 (emphasis added).

■ ¶ 10 The Administrator relies upon a provision of the Oklahoma Uniform Securities Act of 2004,[8] 71 O.S.Supp.2003 § 1–603,[9] the first paragraph of which clearly gives the Administrator the authority to seek equitable relief to stop a person from violating the Act or materially aiding a violation of the Act:

If the Administrator believes that *a person has engaged, is engaging, or is about to engage in an act, practice, or course of business constituting a violation of this act ... or that a person* has, is, or is about

to engage in an act, practice, or course of business that materially aids a violation of this act ... the Administrator may ... maintain an action in the district court of Oklahoma County ... to enjoin the act, practice, or course of business and to enforce compliance with this act....

71 O.S.Supp.2003 § 1–603(A) (material omitted and material emphasized).

Statutory language that confers powers upon a governmental entity is construed according to the general and ordinary meaning of the words used unless the statute authorizes a separate and specific definition for those words. *Boydston v. State,* 1954 OK 327, 277 P.2d 138, 142. Section 1–603(A) refers to actions brought against a person violating the Securities Act or materially aiding a violation of the Act. In the trial court the Department explained that it made no allegation that the defendants violated the securities statutes or materially aided in the violation of those statutes.[10]

---

appoint the Administrator and shall be responsible for the enforcement of this act."

**8.** In 2003 the Legislature created the Oklahoma Uniform Securities Act of 2004 that became effective July 1, 2004. 71 O.S. Supp.2003 § 1–101. The appellate records show that the trial court actions were filed after July 1, 2004, and we apply the new Act to the controversy as briefed by the parties. None of the parties address retroactivity of the Uniform Act, and we decline to address the issue *sua sponte.*

**9.** 71 O.S. Supp.2003 § 1–603. Civil enforcement

A. If the Administrator believes that a person has engaged, is engaging, or is about to engage in an act, practice, or course of business constituting a violation of this act or a rule adopted or order issued under this act or constituting a dishonest or unethical practice or that a person has, is, or is about to engage in an act, practice, or course of business that materially aids a violation of this act or a rule adopted or order issued under this act or a dishonest or unethical practice, the Administrator may, prior to, concurrently with, or subsequent to an administrative proceeding, maintain an action in the district court of Oklahoma County or the district court of any other county where service can be obtained to enjoin the act, practice, or course of business and to enforce compliance with this act or a rule adopted or order issued under this act.

B. In an action under this section and on a proper showing, the court may:

1. Issue a permanent or temporary injunction, restraining order, or declaratory judgment;
2. Order other appropriate or ancillary relief, which may include:
   a. an asset freeze, accounting, writ of attachment, writ of general or specific execution, and appointment of a receiver or conservator, that may be the Administrator, for the defendant or the defendant's assets,
   b. ordering the Administrator to take charge and control of a defendant's property, including investment accounts and accounts in a depository institution, rents, and profits; to collect debts; and to acquire and dispose of property,
   c. imposing a civil penalty up to a maximum of Five Thousand Dollars ($5,000.00) for a single violation or up to Two Hundred Fifty Thousand Dollars ($250,000.00) for more than one violation; an order of rescission, restitution, or disgorgement directed to a person that has engaged in an act, practice, or course of business constituting a violation of this act or the predecessor act or a rule adopted or order issued under this act or the predecessor act, and
   d. ordering the payment of prejudgment and postjudgment interest; or
3. Order such other relief as the court considers appropriate.

C. The Administrator may not be required to post a bond in an action or proceeding under this act.

**10.** The Department stated that "Plaintiff Department has not alleged that the Relief Defendants [the 158 defendants who allegedly made a Ponzi profit] violated the act." No. 104,161, O.R. Vol.

¶11 Title 71 § 1–603, paragraph "B" has three numbered parts as follows:

B. In an action under this section and on a proper showing, the court may:

1. Issue a permanent or temporary injunction, restraining order, or declaratory judgment;

2. *Order other appropriate or ancillary relief,* which may include:

a. an asset freeze, accounting, writ of attachment, writ of general or specific execution, and appointment of a receiver or conservator, that may be the Administrator, for the defendant or the defendant's assets,

b. ordering the Administrator to take charge and control of a defendant's property, including investment accounts and accounts in a depository institution, rents, and profits; to collect debts; and to acquire and dispose of property,

c. imposing a civil penalty up to a maximum of Five Thousand Dollars ($5,000.00) for a single violation or up to Two Hundred Fifty Thousand Dollars ($250,000.00) for more than one violation; an order of rescission, restitution, or disgorgement directed to a person that has engaged in an act, practice, or course of business constituting a violation of this act or the predecessor act or a rule adopted or order issued under this act or the predecessor act, and

d. ordering the payment of prejudgment and postjudgment interest; or

3. *Order such other relief as the court considers appropriate.*

71 O.S. Supp.2003 § 1–603(B), (emphasis added).

The Department argues that "[o]rder other appropriate or ancillary relief" and "[o]rder such other relief as the court considers appropriate" include relief in the form of obtaining a money judgment against the innocent investors.

¶12 The Department relies upon *State ex rel. Day v. Southwest Mineral Energy, Inc.,* 1980 OK 118, 617 P.2d 1334, for the concept that seeking restitution from innocent investors is a power implied from the express statutory powers. In *State ex rel. Day* the defendants were charged with violating registration and anti-fraud provisions of the 1971 version of the Oklahoma Securities Act. *Id.* 617 P.2d at 1335. In *Day* the relief sought against those defendants was disgorgement which the Court defined as "a mandatory order by the Court requiring those who obtain funds from investors or purchasers or lessees in violation of regulatory provisions, to 'disgorge' themselves of the illegally obtained profits." *Id.* In *Day* this Court explained that the unlimited original jurisdiction of all justiciable matters constitutionally conferred on the District Courts of this State makes them courts of equity and law. *Id.* 617 P.2d at 1337–1338, citing, Okla. Const. Art. 7 § 7.[11]

■ ¶13 The innocent investors argue that the language in 71 O.S.Supp.2003 § 1–603(A) limits the scope of who may be a defendant in an action by the Department seeking equitable or other relief pursuant to the authority of paragraph "B" of that statute. For reasons we now explain, although the Department incorrectly characterizes its action as disgorgement, we hold that a District Court has jurisdiction to determine equitable claims brought by the Department against parties allegedly possessing funds obtained from a fraudulent scheme operated by a Department-regulated person or entity.

■ ¶14 Our opinion in *State ex rel. Day, supra,* is consistent with federal courts' construction of the purpose of federal securities laws to divest a wrongdoer of ill-gotten gains by the equitable remedy of disgorgement.[12] While some courts have loosely de-

1, Tab 13, pg. 4, "Plaintiff Oklahoma Department of Securities' Brief in Response to Defendants' Motion for Summary Judgment," No. CJ–2005–3299, consolidated with CJ–2005–3796, filed July 14, 2006, (explanatory phrase added to original).

11. Okla. Const. Art. 7 § 7(a) states in part that "... The District Court shall have unlimited original jurisdiction of all justiciable matters, except as otherwise provided in this Article...."

12. The SEC has had statutory power to seek disgorgement in administrative proceedings since at least 1990 in addition to its older equitable disgorgement power. Verity Winship, *Fair Funds and the SEC's Compensation of Injured*

fined "disgorgement" to include seeking funds to compensate victims of fraud, several federal courts have explained that "disgorgement" requires a person to disgorge funds obtained from his or her violation of securities laws, while "restitution" is a different remedy and refers to compensating victims of the securities fraud for their losses.[13] Federal courts have recognized that the lack of express federal statutory authorization to order disgorgement does not to frustrate a court of equity in giving effect to the legislative policy behind the regulatory enact-

ments.[14] Giving effect to the legislative policy is defined as a court providing "complete relief in light of the statutory purposes;"[15] i.e., individuals who had violated securities laws were required to disgorge their ill-gotten profits.[16] Disgorgement is not for the purpose of compensating victims, although compensation of victims often results from disgorgement. For example, "The purpose of disgorgement is not to compensate the victims of the fraud, but to deprive the wrongdoer of his ill-gotten gain."[17] The legislative history of disgorgement shows that it

*Investors*, 60 Fla. L.Rev. 1103, 1112 (2008) (author cites the Securities Enforcement Remedies and Penny Stock Reform Act of 1990, Pub.L. No. 101–429, § 102(e), 104 Stat. 931 (1990), codified as amended at 15 U.S.C. § 80a–9(e) (2006)). See *SEC v. DiBella*, 409 F.Supp.2d 122, 130–133 (D.Conn.2006) (discussed history of disgorgement and the lack of specific statutory authority).

13. *See, e.g., SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir.1993) ("Disgorgement does not aim to compensate the victims of the wrongful acts, as restitution does."); *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir.1987), *cert. denied*, 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988), (distinguishing between disgorgement and restitution and stating that whether or not any investors may be entitled to money damages is immaterial for the purpose of disgorgement); *SEC v. Drexel Burnham Lambert, Inc.*, 956 F.Supp. 503, 507 (S.D.N.Y.1997) (same). *See also SEC v. Lorin*, 869 F.Supp. 1117, 1122, 1123 (S.D.N.Y.1994) ("... disgorgement merely returns the wrongdoer to the status quo before any wrongdoing had occurred.... SEC actions seeking disgorgement differ slightly from 10b–5 actions in that they do not attempt to redress a private injury, but rather aim to separate the securities law violator from his or her unlawfully obtained profits."); Verity Winship, *Fair Funds and the SEC's Compensation of Injured Investors*, 60 Fla. L.Rev. 1103, 1113 (2008) ("Courts have adopted the view that disgorgement is primarily aimed at deterring violators by depriving them of profit. On this ground, they have held that the appropriateness of disgorgement does not depend on the identification of harmed private parties or the distribution of this amount to those harmed.").

14. *Mitchell v. Robert DeMario Jewelry*, 361 U.S. 288, 291–292, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960), (principle giving complete relief in light of the statutory purposes is shown in the context of construing the Fair Labor Standards Act of 1938); *United States v. Moore*, 340 U.S. 616, 71 S.Ct. 524, 95 L.Ed. 582 (1951), (when construing Housing and Rent Act of 1947 the Court stated that an equitable decree of restitution would be within the section if it was reasonably appropriate and necessary to enforce compliance with the

Act and effectuate its purposes); *Porter v. Warner Holding Co.*, 328 U.S. 395, 400, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), (in the context of construing the Emergency Price Control Act of 1942 the Court indicated that its ruling was to give effect to a congressional purpose to authorize whatever equitable order may be considered appropriate and necessary to enforce compliance with the Act).

15. *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291–92, 80 S.Ct. 332, 335, 4 L.Ed.2d 323 (1960) ("When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes.").

16. Disgorgement by those who violated federal securities laws has long been held to be within a court's equitable powers. *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301 (2nd Cir.), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 562, 30 L.Ed.2d 558 (1971), (the defendants, appealing an order of restitution of illegal profits derived from a § 10(b) violation, unsuccessfully argued that the SEC had no authority under the Act to seek any relief other than the injunctive relief provided in § 21(e) [currently § 21(d)] ); *SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir.1990) ("An individual found liable for fraudulently trading federal securities may properly be ordered to disgorge any ill-gotten profits."); *SEC v. Tome*, 833 F.2d 1086, 1096 (2nd Cir.1987) *cert. denied*, 486 U.S. 1015, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988) (upholding order of disgorgement of illegal proceeds from those guilty of insider trading in violation of §§ 10(b) and 14(e)); *SEC v. Materia*, 745 F.2d 197, 200–201 (2nd Cir.1984) *cert. denied*, 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985), (holding that section 21(d) does not restrict the available remedies to injunctive relief when disgorgement is sought against a person who violated § 10(b)).

17. *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978), *citing, SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 102 (2d Cir.1978).

was not designed to compensate victims.[18]

¶ 15 Disgorgement is an exercise of a state's police or regulatory powers.[19] When the SEC seeks disgorgement it is acting in a sovereign governmental capacity. For example, statutes of limitation do not apply to bar equitable relief for disgorgement of ill-gotten gains from a wrong-doer.[20] This concept was explained at length in *SEC v. Lorin*, 869 F.Supp. 1117 (S.D.N.Y.1994), where that court discussed whether the Federal Securities and Exchange Commission (SEC) possessed a *public interest* to seek disgorgement or whether the SEC's action was merely a substitute for a private right of action.

> ... litigants and legal commentators have contended that SEC actions seeking disgorgement do not constitute the pursuit of a public interest or right because the SEC regularly turns over the disgorged proceeds to the victims of the violations; as a result, they assert, SEC enforcement actions serve as simple substitutes of the Rule 10b–5 actions that the victims might otherwise bring and consequently vindicate the rights of those private victims and not the public as a whole....
>
> Notwithstanding what appears to be the practical equivalence of SEC actions and those that private parties can bring, *the SEC's position finds great support in the fact that its statutory authorization to bring civil enforcement actions does not require it to turn disgorged proceeds over to the private investors who have been damaged by the violator's activity; rather, disgorged proceeds can very well end up in the United States Treasury,* for example, (1) where numerous victims suffered

relatively small amounts thereby making distribution of the disgorged proceeds to them impractical, ... (2) where the victims cannot be identified, ... and (3) where there are no victims entitled to damages, ...

> In this way, the SEC's actions differ from actions brought by the EEOC, discussed in *Occidental Life,* [*Occidental Life Insurance Co. v. EEOC*, 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977).] where the back pay sought against an employer, must, by statutory definition, be turned over to the individual who of course could have brought a private action. This difference persists despite the fact that the SEC's authorization does not go so far as to prohibit it from so distributing disgorged proceeds. As a result, unlike the situation described by the dissent in *Occidental Life,* the United States is not precluded from gaining something "tangible" as a result of the type of SEC suits at issue here.
>
> I therefore find that the SEC action at issue here operates to vindicate a public interest and, accordingly, that it is improper to "borrow" a limitation period. *The element of SEC actions that I find dispositive in terming them public interest actions is their allowance for the United States to itself obtain a monetary benefit.* The fact that SEC actions often benefit private parties does not persuade me that they cannot simultaneously serve the public interest. *See also* Comment, Christopher R. Dollase, *The Appeal of* Rind: *Limitations of Actions in Securities and Exchange Commission Civil Enforcement*

---

**18.** Verity Winship, *Fair Funds and the SEC's Compensation of Injured Investors*, 60 Fla. L.Rev. 1103, 1117 (2008) citing H.R. Rep. 101–616, at 31 (1990), reprinted in 1990 U.S.C.C.A.N. 1379, 1389.

**19.** *In re Nelson*, 240 B.R. 802, 806 (Bkrtcy.D.Me. 1999) (bankruptcy stay did not stay state's action based upon violations of unfair trade practices and consumer solicitation sales and seeking injunctive relief, restitution, and civil penalties as relief was pursuant to police or regulatory powers); *SEC v. Towers Fin. Corp.*, 205 B.R. 27 (S.D.N.Y.1997), (SEC action against debtor seeking disgorgement of investor funds, as well as injunctive relief, was excepted from the bank-

ruptcy stay as an exercise of police and regulatory powers, rejecting debtor's argument that SEC was seeking a pecuniary benefit); *Bilzerian v. SEC*, 146 B.R. 871, 873 (Bankr.M.D.Fla.1992), ("in this instance, disgorgement is a remedy sought by the SEC in furtherance of its police powers under the Securities Laws.").

**20.** *SEC v. Tambone*, 550 F.3d 106, 148 (1st Cir. 2008); *SEC v. Diversified Corporate Consulting Group*, 378 F.3d 1219, 1224 (11th Cir.2004); *SEC v. Rind*, 991 F.2d 1486, 1490–91 (9th Cir.), cert. denied, 510 U.S. 963, 114 S.Ct. 439, 126 L.Ed.2d 372 (1993); *SEC v. Lorin*, 869 F.Supp. 1117, 1120–1130 (S.D.N.Y.1994).

*Actions,* 49 Bus.Law. 1793, 1814 (1994) ("There does not need to be a complete demarcation between public interest and benefits to individuals."). Several cases have recognized, in other contexts, the dual benefit that SEC actions create. *SEC v. Tome,* 833 F.2d 1086, 1096 (2d Cir.1987) ("The *paramount purpose* of ... disgorgement is to make sure that wrongdoers will not profit from their wrongdoing." (emphasis added)), *cert. denied,* 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988); *SEC v. Commonwealth Chem. Sec., Inc.,* 574 F.2d 90, 102 (2d Cir.1978) ("[T]he *primary purpose* of disgorgement is not to compensate investors. Unlike damages, it is a method of forcing a defendant to give up the amount by which he was unjustly enriched." (emphasis added)); *cf. SEC v. Penn Cent. Co.,* 425 F.Supp. 593, 599 (E.D.Pa.1976) ("The fact that *one consequence* of the action may be to benefit private parties does not detract from the public purpose of effectuating the goals of the securities laws." (emphasis added)).

*SEC v. Lorin,* 869 F.Supp. at 1128–1129 (material omitted and emphasis added).

The potential payment to the U.S. Treasury was a *dispositive* element showing that the SEC was litigating a *public interest* when seeking disgorgement. While Congressional authority was given to the SEC to retain disgorged funds with their ultimate payment to the U.S. Treasury, no similar legislative authority is shown for the Department to seize disgorged or restitution funds and pay them to the State Treasurer.

¶ 16 *SEC v. Lorin* also refers to the public purpose of effectuating the goals of securities laws. Section 1–603 expressly authorizes both disgorgement and restitution involving a person who has violated the securities laws.

B. In an action under this section and on a proper showing, the court may:

... 2. Order other appropriate or ancillary relief, which may include:

... c. imposing a civil penalty up to a maximum of Five Thousand Dollars ($5,000.00) for a single violation or up to Two Hundred Fifty Thousand Dollars ($250,000.00) for more than one violation; *an order of rescission, restitution, or disgorgement directed to a person that has engaged in an act, practice, or course of business constituting a violation of this act* or the predecessor act or a rule adopted or order issued under this act or the predecessor act, and....

71 O.S.Supp.2003 § 1–603(B)(2)(c) (emphasis added and material omitted).

Departmental action for disgorgement *and* restitution against one who has violated securities laws serves an obvious public purpose. Does the Department's action for restitution against an innocent investor serve a public purpose? The short answer is yes, if the nature of the transaction between the Ponzi operator and innocent investor is inequitable and the innocent investor's right to the funds becomes merely possessory.

¶ 17 Typical of the authority cited by the Department in the present case is *SEC v. Cross Financial Services, Inc.,* 908 F.Supp. 718 (C.D.Cal.1995), where the court stated the following:

According to *Cherif,* a district court has power to grant relief with respect to property to which non-violators have no valid claim. *Under these circumstances, the touchstone is whether the non-party's claim to the property is legitimate, not whether the party is innocent of fraud or wrongdoing.*

*Id.* at 732, emphasis added.

The Department construes this language to mean that the SEC has power to grant disgorgement against non-violators. *Cross Financial Services* relied upon *SEC v. Cherif,* 933 F.2d 403 (7th Cir.1991), for the proposition that disgorgement is an equitable remedy available against a non-violator if it is established that the non-violator possesses illegally obtained profits but has no legitimate claim to them. In *SEC v. Cherif,* 933 F.2d 403 (7th Cir.1991), the SEC made an argument virtually identical to that of the Department in this case. One party therein, Sanchou, objected to being named in an action brought by the SEC because he had not been accused of any securities violations. The federal court explained that the SEC's reading of the applicable federal statute was incorrect.

*15 U.S.C. §§ 78u(d) and (e) also cannot aid the SEC since the statute is not so broadly written as the SEC contends. The statute has been construed to allow the granting of "any form of ancillary relief * * * where necessary and proper to effectuate the purposes of the statutory scheme." Materia, 745 F.2d at 200. Language about the importance of granting complete equitable relief, however, must be read in context. Usually the language advocates that all equitable powers residing in the district court be visited upon the defendant or violator before the court. See id.; Farrand, Ancillary Remedies in SEC Civil Enforcement Suits, 89 Harv.L.Rev. 1779 (1976). Nothing in the statute or case law suggests that 15 U.S.C. § 78u(d) or (e) authorizes a court to freeze the assets of a non-party, one against whom no wrongdoing is alleged.*

SEC v. Cherif, 933 F.2d 403, 414 (emphasis added).

The Seventh Circuit rejected the SEC's position that securities statutes authorized an asset freeze against a person it classified as a "non-party" since he had not violated the securities laws. *Id.* The Oklahoma Department of Securities recognizes this holding of Cherif because it relies not upon the holdings of the opinion, but upon a footnote therein stating that "A court can obtain equitable relief from a non-party against whom no wrongdoing is alleged if it is established that the non-party possesses illegally obtained profits *but has no legitimate claim to them.*" *Id.* at 414, n. 11 (emphasis added).

¶ 18 A party added by the SEC as a *nominal defendant* has no legal claim to the proceeds of the property other than a possessory claim.

A nominal defendant is a person who "holds the subject matter of the litigation in a subordinate or possessory capacity as to which there is no dispute." ... The paradigmatic nominal defendant is "a trustee, agent, or depositary ... [who is] joined purely as a means of facilitating collection." *Id.* (internal quotations and citation omitted). As the nominal defendant has no legitimate claim to the disputed property, he is not a real party in interest. Accordingly, "there is no claim against him and it is unnecessary to obtain subject matter jurisdiction over him once jurisdiction of the defendant is established."

SEC v. Colello, 139 F.3d at 676 (9th Cir. 1998), quoting SEC v. Cherif, 933 F.2d at 414 (footnote and material omitted).

A usual nominal defendant is a bank or trustee, which has only a custodial claim to the property. *SEC v. Colello, supra* at 677. For example, one court has recognized that the SEC could freeze assets held by a non-culpable third party when the assets belong to, or are in route to, a securities-culpable entity, or when the culpable entity controlled the assets as a matter of law, or when the non-party is innocent with respect to the securities violation and is named as a "nominal party" to recover proceeds of fraud. *SEC v. Black,* 163 F.3d 188, 196–197 (3d Cir.1998).[21] Thus, the "nominal party" distinction maintains the concept that the funds are being disgorged by the wrongdoer, although those funds were held by a non-culpable third party. In *Colello* the SEC characterized a nominal party's claim to funds as an affirmative defense, but the court disagreed and stated that "the lack of a legitimate claim to the funds is the defining element of a nominal defendant." *SEC v. Colello,* 139 F.3d at 677.

¶ 19 The Defendants cast this issue as a jurisdictional dispute. Subject matter jurisdiction exists when a court has power to proceed in a case of the character presented, or power to grant the relief sought in a proper cause. *State ex rel. Turpen v. A 1977 Chevrolet Pickup Truck,* 1988 OK 38, ¶ 10, 753 P.2d 1356, 1359 quoting, *Consolidated Mtr. Frt. Terminal v. Vineyard,* 1943 OK 358, 143 P.2d 610, 612. The power to proceed is acquired by an application of a party

---

**21.** We need not discuss or attempt to harmonize federal court opinions discussing freezing funds held by nominal third parties. *SEC v. Black, supra,* and *SEC v. Cherif, supra,* are not dispositive whether an asset freeze authorized by 71 O.S. § 1–603(B)(2) includes an asset freeze of funds held by an innocent third party to a Ponzi scheme. We need not adjudicate that issue to address the arguments raised by the parties herein, and we expressly decline to reach that issue.

showing the general nature of the case and requesting relief of the kind the court has power to grant. *Id.* Subject matter jurisdiction is invoked by the pleadings filed with the court. *State ex rel. Oklahoma Tax Com'n v. Texaco Exploration,* 2005 OK 52, ¶ 14, 131 P.3d 705, 709.

¶ 20 In our case today the Defendants *allege* that the Department's action is not against nominal parties, but against parties who have more than possessory rights to the funds and that the Department lacks jurisdiction to proceed against them. The Department *alleges* that Defendants possess funds transferred to them as part of an investment scheme which violated securities laws that the Department has authority to enforce, that these funds rightfully belong to other investors, that the Department has authority file a claim in a District Court to gain funds wrongfully transferred pursuant to violations of securities laws, that the Defendants are *nominal parties,* and that a District Court has jurisdiction to adjudicate competing claims concerning ownership of funds that were part of that scheme. The status of the defendants as nominal, as alleged by the Department, goes to the merits of the Defendants' claim to ownership of the contested funds. We hold that an Oklahoma District Court has subject matter jurisdiction to adjudicate competing claims of ownership to funds that were part of an investment scheme which violated the securities laws.[22]

## III. Equitable Relief Against Innocent Investors

¶ 21 The Department argues that when an innocent investor receives a profit from investment in a Ponzi scheme the amount of the profit is inequitable as a matter of law, the investor's right to the profit is merely possessory as a matter of law, and equity provides relief in the form of a legal proceeding for restitution of those funds to the innocent investors who did not make a profit. We agree with the Department that the nature of the transaction between the Ponzi operator and innocent investor *may* be inequitable and the innocent investor's right to the funds becomes merely possessory, but we disagree that the profit is, as a matter of law, inequitable and thereby subject to a restitution proceeding. Whether a profit is unjust enrichment that a District Court should rectify presents a mixed question of fact and law.

¶ 22 Unjust enrichment is a condition which results from the failure of a party to make restitution in circumstances where not to do so is inequitable, *i.e.,* the party has money in its hands that, in equity and good conscience, it should not be allowed to retain. *Harvell v. Goodyear Tire & Rubber Co.,* ¶ 18, 164 P.3d 1028, 1035.[23] Some states define unjust enrichment with four parts: (1) the unjust (2) retention of (3) a benefit received (4) at the expense of another.[24] We ex-

---

**22.** The third element of jurisdiction, jurisdictional power to render the particular judgment, is raised by the arguments in this case. This jurisdictional element focuses on the actual judgment sought or obtained and whether it violates mandatory law. *See, e.g., Gulfstream Petroleum Corp. v. Layden,* 1981 OK 56, 632 P.2d 376 (compulsory statutory requirement antecedent to judgment or final order must be fulfilled to satisfy third element of jurisdiction); *Abraham v. Homer,* 1924 OK 393, 102 Okla. 12, 226 P. 45, 48 (facts showing compliance with a procedural statute mandatorily required for a judgment are material to the existence of the power of the court to render that judgment). No violation of mandatory law is shown by the Defendants herein.

**23.** It is not necessary to discuss the debate over the distinction, if any, between restitution and unjust enrichment in order to decide the present controversy. *See, e.g.,* Colleen P. Murphy, *Misclassifying Monetary Restitution,* 55 SMU L.Rev.

1577 (2002); Andrew Kull, Rationalizing Restitution, 83 Cal. L.Rev. 1191, 1193 (1995) ("The modern consensus puts unjust enrichment at the heart of liability in restitution, so the question, simply put, is whether restitution properly includes anything else.").

**24.** Variations of this description include courts focusing on the benefit being something conferred on the defendant by the plaintiff. *See, e.g., Berry and Gould, P.A. v. Berry,* 360 Md. 142, 757 A.2d 108, 113 (2000) (unjust enrichment is "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value."); *Ragland v. Sheehan,* 256 Mont. 322, 846 P.2d 1000, 1004 (1993) (unjust enrichment is an equitable doctrine wherein the plaintiff must show some element of miscon-

plained in *Harvell v. Goodyear Tire & Rubber Co., supra,* that elements of unjust enrichment claims differ markedly from state to state. 2006 OK 24, ¶ 20, 164 P.3d at 1036. One element of the claim which does not receive uniform treatment by courts is whether the party against whom relief is sought has engaged in wrongful conduct.[25]

¶ 23 We have explained that a "careful reading" of opinions in Oklahoma shows that when a constructive trust is sought to remedy unjust enrichment, there must be some active wrongdoing on the part of the person against whom recovery is sought:

> The primary reason for imposing a constructive trust *is to avoid unjust enrichment.* It is imposed against one who "by fraud, actual or constructive, by devices or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy." ... *A careful reading of the cases in this jurisdiction, in which the imposition of a constructive trust was sought, reveals that an element of unfairness in allowing the legal title holder to retain the property is not sufficient to justify the imposition of a constructive trust. There must also be some*

active wrongdoing on the part of the person against whom recovery is sought.... *Easterling v. Ferris,* 1982 OK 99, 651 P.2d 677, 680 (emphasis added, citations and material omitted).

In *French Energy, Inc. v. Alexander,* 1991 OK 106, 818 P.2d 1234, 1237–1238, we explained that unjust enrichment based upon "innocent misrepresentation or non-disclosure" may be used to justify restitution. To satisfy these principles, the Department must prove that an innocent investor's conduct of possessing a Ponzi-scheme profit is, *by itself,* active wrongdoing or possession against equity and good conscience sufficient to justify a constructive trust imposed by a District Court.

¶ 24 The Department's arguments that the Defendants were unjustly enriched may be summarized by the following quote from the Department's briefs:

> To allow defendants to keep money that does not belong to them in exchange for nothing would result in them being substantially unjustly enriched. [And] or The Department is authorized to seek the disgorgement of the funds received by Defendants that were in excess of the reasonable equivalent value exchanged.[26]

We agree that a Ponzi-scheme profit received by an innocent investor *may* represent unjust enrichment when a reasonably equivalent value has not been exchanged, as we now explain.

---

duct or fault on the part of defendant or that defendant somehow took advantage of plaintiff); *Jo–Ann Stores, Inc. v. Property Operating Co., LLC,* 91 Conn.App. 179, 194, 880 A.2d 945, 955 (2005) (a plaintiff seeking recovery for unjust enrichment must prove (1) that the defendant was benefitted, (2) that the defendant unjustly did not pay the plaintiff for the benefit, and (3) that the failure of payment was to the plaintiff's detriment); *Danforth v. Ruotolo,* 650 A.2d 1334, 1335 n. 2 (Me.1994) ("The elements of unjust enrichment are (1) a benefit conferred on defendant by plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention of the benefit in circumstances that make it inequitable for the defendant to retain the benefit without payment for the value of the benefit conferred."); *Heimann v. Kinder–Morgan CO2 Co., L.P.,* 140 N.M. 552, 144 P.3d 111, 118 (2006) *cert. denied,* 552 U.S. 1062, 128 S.Ct. 707, 169 L.Ed.2d 553 (2007) (unjust enrichment is a theory under which an aggrieved

party may recover from another party who has profited at the expense of the aggrieved party).

**25.** In *Harvell,* 2006 OK 24, n. 36, 164 P.3d at 1036, we provided three examples: *DCB Construction Co., Inc. v. Central City Development Co.,* 965 P.2d 115, 119 (Colo.1998) (holding that unjust enrichment requires a showing of improper, deceitful, or misleading conduct); *Schock v. Nash,* 732 A.2d 217, 232 (Del.1999) (allowing for restitution, even when defendant is not a wrongdoer); *Anderson v. DeLisle,* 352 N.W.2d 794, 796 (Minn.App.1984) (unjust enrichment claim allowable in situations where enrichment was morally wrong).

**26.** The quotations are found in the record at the following: O.R. No. 105,682, Vol. 1, Department's motion for summary judgment, 63, 69–69; O.R. 105,682, Vol. 2, Department's response to Defendants' motion for summary judgment, at 796–797.

¶ 25 Bankruptcy-related actions against innocent investors in a Ponzi scheme who received a profit on their investments is common. One commentator in 1998 observed the following:

> The largest assets of a Ponzi-scheme [bankruptcy] estate typically are the claims that the estate has against those investors who received "returns" on their investments. A trustee of a Ponzi-scheme estate may sue to recover such payments to investors pursuant to the fraudulent transfer and preference provisions of the Bankruptcy Code. In March 1998, the trustee of *Bennett Funding* filed over 10,000 lawsuits against former investors, seeking recovery of $100 million in alleged fraudulent transfers. Amounts recovered from such investors can then be ratably distributed to all of the creditors, both investors who lost money in the scheme, and other, noninvestor creditors of the estate.

Mark A. McDermott, *Ponzi Schemes and the Law of Fraudulent and Preferential Transfers*, 72 Am. Bankr.L.J. 157, 158–159 (1998), (note omitted).

One court has explained that the examination by bankruptcy courts of alleged fraudulent transfers in Ponzi schemes has resulted in two distinct lines of cases.

> As the district court noted in *Daly v. Deptula (Carrozzella & Richardson)*, 286 B.R. 480, 487 (D.Conn.2002) "[t]here is sharp split of authority on the issue of whether the payment of interest [or some other form of return to a Ponzi scheme investor] by a Ponzi scheme operator can ever constitute reasonably equivalent value." 286 B.R. at 487. Describing the legal reasoning supporting the first line of authority, which holds that any transfer by a debtor to a Ponzi scheme investor over and above the amount of the transferee's initial investment is not, *as a matter of law,* supported by reasonably equivalent value, .... (Discussion of first of two competing principles/rationales and citations omitted.)

*Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 639 (Bankr.S.D.Ohio 2006).

This first line of cases makes all Ponzi profits, as a matter of law, unsupported by the exchange of a reasonably equivalent value.[27]

¶ 26 The second line of cases makes the issue of reasonably equivalent value a question of fact, and was explained by the court as follows.

> [The second line of authority] focuses on the discrete transaction between the debtor and the defendant, without regard to the nature of the debtor's overall enterprise. The[se] cases have cited the narrow language of the Uniform Fraudulent Transfer Act that refers to the transfer at issue [*see, e.g.,* Ohio Rev.Code Ann. § 1336.05, which provides that a transfer is avoidable if the debtor made the transfer "without receiving reasonably equivalent value in exchange for the transfer"]. The[se] courts have measured what was given against what was received *in that transaction* .... [and have] described the "fatal legal flaw" in the reasoning adopted by the ... [first] line of cases ... as follows:
>
> [I]t focuses not on a comparison of the values of the mutual consideration actually exchanged in the transaction between the [transferee] and the [d]ebtor, but on the value, or more accurately stated, the supposed significance or consequence of the [transferee-debtor] transaction in the context of the [d]ebtor's whole Ponzi scheme.... [T]he statutes and case law do not call for the court to assess the impact of an alleged fraudulent transfer in a debtor's overall business. The statutes require an evaluation of the specific consideration exchanged by the debtor and the transferee in the specific transaction which the trustee seeks to avoid, and if the transfer is equivalent in value, it is not subject to avoidance under the law....
>
> [In the decisions comprising the second line of authority] [t]he courts have ... looked to the plain language of the Bankruptcy Code and the state-law fraudulent transfer acts that define "value" as including "satisfaction ... of an antecedent debt." 11 U.S.C. § 548(d)(2)(A); [Ohio

---

**27.** Oklahoma's Uniform Fraudulent Transfer Act, not at issue in this case, also uses the concept of "reasonably equivalent value." 24 O.S.2001 § 116(B)(8), § 117(A).

Rev.Code Ann. § 1336.03(A) ]. [They hold] that the payment of interest to innocent investors pursuant to a contractual obligation clearly constitute[s] the satisfaction of an antecedent debt and, therefore, based upon the clear language of the statute, should be considered as the receipt of value by the debtor[,] ... reason[ing] that the debtor's use of the investor's funds for a period of time supported the payment of reasonable contractual interest and, [these courts further note that] if Congress did not intend such a result when the debtor was involved in a Ponzi scheme, it should so specify in the Bankruptcy Code rather than leaving it to the courts to ignore what is clearly value and fair consideration under the fraudulent conveyance statutes. To hold otherwise, the[se] [c]ourt[s] [reason], would ignore the universally accepted fundamental commercial principal that, when you loan an entity money for a period of time in good faith, you have given value and you are entitled to a reasonable return.

The[se] [c]ourt[s] also question[ ] why innocent investors should be treated any differently than a Ponzi-scheme operator's trade creditors, such as utility companies and landlords, since the payment of contractual debts owing to these trade creditors diminishes the debtor's estate in the same manner that payment of reasonable contractual interest to innocent investors diminishes the estate....

[Cases adhering to this view] note[ ] that the[ ] decisions [comprising the first line of authority] have failed to explain why [an] illegal and unenforceable contract allows the repayment of principal but not interest.... [These courts point out] that allowing an investor to retain reasonable contractual interest does not further a Ponzi scheme any more than allowing that investor to retain repaid principal.

*Rieser v. Hayslip (In re Canyon Sys. Corp.),* 343 B.R. 615, 640–641 (explanatory marking in original) quoting *Daly v. Deptula (Carrozzella & Richardson),* 286 B.R. 480, 488–490 (D.Conn.2002) (citations and quotation marks omitted).

The second line of cases examines whether the innocent investor received the funds for satisfaction of an antecedent debt and if the funds received by the investor were based upon a reasonable contractual interest. This second line of authority points out that for the purpose of fraudulent transfers and *if the first line of cases is followed,* then a Ponzi investor should return *both the repaid initial investment and any profit received* if a court treats the Ponzi transactions as lacking an exchange of reasonably equivalent value. In other words, if the first line of cases is followed and a court holds that a profit is transferred for less than a reasonable contractual interest as a matter of law, such holding would also necessitate an investor returning the recovered original investment to a receiver for pro rata distribution to all investors.

¶ 27 We prefer to follow the second line of authority and apply it to a claim in equity for restitution. Equity is based upon the circumstances of the particular case before the court.[28] Some courts have granted equity relief against Ponzi-investors who received a profit while noting the inequity inherent when granting that relief.

> We are aware that it may create a significant hardship when an innocent investor such as Kowell is informed that he must disgorge profits he earned innocently, often years after the money has been received and spent. Nevertheless, courts have long held that it is more equitable to attempt to distribute all recoverable assets among the defrauded investors who did not recover their initial investments rather than to allow the losses to rest where they fell. *See Scholes,* 56 F.3d at 757 ("[I]t may seem 'only fair' that [the early investor] should be entitled to the profits ... made with his money.... [However, h]e should not be permitted to benefit from a fraud at [later investors'] expense merely because he was not himself to blame for the fraud.").

**28.** *Harrell v. Samson Resources Co.,* 1998 OK 69, ¶ 24, 980 P.2d 99, 106; *Heiman v. Atlantic Richfield Co.,* 1995 OK 19, 891 P.2d 1252, 1257.

*Donell v. Kowell,* 533 F.3d 762, 776 (9th Cir.2008) (note omitted).

The inequity in forcing restitution of profits from innocent investors has kept some courts from ordering the restitution.

> Some investors who received "fictitious profits" may have spent the money on education or other necessities many years ago. What else in equity and good conscience should plaintiffs who received money in good faith pursuant to an "investment contract" have done? In contrast, some investors who lost money may have been speculators who were prepared to lose their investments. There is simply no neat answer to the various equities involved here where the investors never knew each other and were equally at fault for trusting Chilcott. "Unexpected gains or losses by equally innocent parties may present similar problems, not capable of resolution by unjust enrichment principles." Dobbs, *Remedies,* § 4.1 (1973). There is no precedent in law or equity for applying unjust enrichment principles in these circumstances. In such circumstances the courts may simply leave the parties where they were found.

**29.** Leaving the parties where they are found *appears* to be based not only on the substantial differences concerning individual innocent investors, but also upon equitable principles that assets are not marshaled to destroy equal equities, and when the equities are equal the loss or harm must be borne by the party upon whom it has fallen. *In re Martin,* 1994 OK 48, 875 P.2d 417, 421; *Roberts v. Sterr,* 1957 OK 133, 312 P.2d 449, 451. We are not presented in this case with an innocent investor acting in bad faith, or with an investor who is related to Schubert. *See, e.g., Renberg v. Zarrow,* 1983 OK 22, 667 P.2d 465, 471 ("A court of equity will not enforce stock transfer restrictions for close corporation adopted under circumstances which indicate bad faith and inequitable treatment of stock purchasers.").

**30.** *State ex rel. Cartwright v. Tidmore,* 1983 OK 116, 674 P.2d 14, 17 ("laches and estoppel do not apply against the state acting in its sovereign capacity because of mistakes or errors of its employees"); *State ex rel. Oklahoma Tax Comm'n v. Emery,* 1982 OK CIV APP 13, 645 P.2d 1048, 1051 (same), (Approved for Publication by Supreme Court).

*Johnson v. Studholme,* 619 F.Supp. 1347, 1350 (D.Colo.1985), *aff'd,* 833 F.2d 908 (10th Cir.1987).

All of the circumstances present "various equities" with different investors and some courts have declined to find an equitable right to restitution from Ponzi profits held by another investor, and others have found that equitable right.[29]

■ ¶ 28 An action by the Department, a state agency, against innocent investors to recover Ponzi-profits paid "many years ago" is a concern for courts since the State would appear to be pursuing a public, and not private, interest. The concern arises, in part, because (1) In an equitable proceeding defenses such as laches and estoppel are *generally* not available against the state and its agencies acting in a sovereign capacity,[30] unless application of equitable defenses would further a principle of public policy or interest;[31] and (2) The argument of the Department herein is that there exists no legal or equitable interests in the profits held by Defendants, and that no public policy exists herein that would support thwarting the Department seeking relief against the Defendants.

¶ 29 The SEC protects investors[32] while taking into consideration whether its actions

**31.** *Indiana Nat'l Bank v. State Dept. of Human Services,* 1993 OK 101, 857 P.2d 53, 64 ("The general rule is the application of estoppel is not allowed against the state, political subdivisions or agencies, unless it would further a principle of public policy or interest."); *Burdick v. Independent School Dist.,* 1985 OK 49, 702 P.2d 48, 53 (same). This controversy does not require us to either explain *State ex rel. Cartwright v. Tidmore, supra,* and *Indiana Nat'l Bank, supra,* or reexamine our opinions that state when a state agency goes into court on its own volition it will be treated as any other litigant and must concede to the defendant the right to plead and establish, by competent evidence, any legal or equitable defense the defendant might establish as against a private litigant. *See, e.g., Independent School District No. 16 of Payne County v. Reed,* 1972 OK 150, 503 P.2d 1265, 1268 and quoting stated principle from *State ex rel. Commissioners of Land Office v. Sparks,* 1953 OK 39, 253 P.2d 1070.

**32.** *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2507, 168 L.Ed.2d 179 (2007). *See, e.g., Schiller v. Tower Semiconductor, Ltd.,* 449 F.3d 286, n. 5, 292 (2d Cir. 2006) (court notes the SEC's power pursuant to the National Securities Markets Improvement

"will promote efficiency, competition, and capital formation."[33] The Administrator of the Department also protects the public and investors. There is no doubt that some federal courts have allowed actions by the SEC against Ponzi-investors for *any* profits and have based the relief awarded upon an unjust enrichment theory. A Ponzi scheme, according to one definition, is "[a] fraudulent investment scheme in which money contributed by later investors *generates artificially high* dividends for the original investors, whose example attracts even larger investment." *Black's Law Dictionary*, 1180 (7th Edition 1999) (emphasis added). The Department argues for an equitable right to restitution regardless of the reasonableness of the return or dividend obtained by an innocent investor. We conclude that this approach is contrary to the equities involved in a Ponzi scheme where an innocent investor relies upon the advice of a licensed investment dealer and the investor does not receive an artificially inflated Ponzi-scheme profit.

¶ 30 We hold that the Department may seek relief against Ponzi investors who received profits that are artificially high dividends. However, we decline to recognize authority by the Department to seek restitution from innocent Ponzi-scheme investors who received their investment with a reasonable interest thereon. Our holding is based upon the principle that the Department possesses a public interest in seeking restitution *for investors* who did not receive the return of their initial investment, and that the Department's unjust enrichment claim is brought against investors who received unreasonable high dividends in a Ponzi-scheme.

## IV. Action by Court Appointed Receiver Against Innocent Investors

¶ 31 A District Court appointed Douglas L. Jackson as a receiver for the investors and creditors of Schubert & Assoc. and for the assets of Marsha Schubert, individually, and doing business as Schubert & Associates, and for Schubert & Associates. An issue raised by these appeals is whether a court appointed receiver may proceed against the innocent investors.

¶ 32 Defendants argue[34] that the receiver holds title to property of the estate with the same right and title as those who hold claims against the estate, that the receiver may not hold an antagonistic position as creditor against the estate, that the receiver may not favor one investor over another, and that a receiver for a sole proprietorship could not recover an alleged fraudulent conveyance. *In re O K Investment Corp.*, 1977 OK 33, 560 P.2d 969, we quoted from *Hudson v. Hubbell*, 1935 OK 138, 171 Okla. 201, 41 P.2d 844, and stated the following:

> Receivers are appointed to conserve the property pending litigation, for the benefit of those interested as parties to the action. Usually, as in this case, the property is taken charge of before judgment is rendered. Its supervision and disposition is under the direction of the court. A receiver has only such powers as are granted by order of the court, and he acts under the direction of the court. . . .

*In re O K Investment Corp.*, 560 P.2d at 970.

The statutory power of a receiver is as follows:

> The receiver has, under the control of the court, power to bring and defend actions in his own name, as receiver; to take and keep possession of the property, to receive rents, to collect debts, to compound for and compromise the same, to make transfers, and generally to do such acts respecting the property as the courts may authorize.

12 O.S.2001 § 1554.

A receiver not only takes possession of property, *In re O K Investment Corp., supra*, but also has authority to bring an action in a District Court to obtain property

---

33. *Credit Suisse Securities (USA) LLC v. Billing*, 551 U.S. 264, 127 S.Ct. 2383, 2396, 168 L.Ed.2d 145 (2007).

34. *See, e.g.*, No. 104,004, Defendants/Appellants' petition for certiorari at 5–6.

Act of 1996 to exempt a person, security, transaction, etc., from specified statutes, rules, or regulations, "to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors.").

possessed by a person or entity other than the entity the receiver is appointed for. While Defendants appear to recognize that a receiver may bring an action in District Court, they argue that a receiver may not bring this particular action seeking equitable relief.

¶ 33 In this case the District Court of Logan County defined the assets over which the receiver was appointed as including the proceeds obtained by certain participants in the Ponzi-scheme whereby they were "unjustly enriched or received fraudulent transfers." Defendants argue that a receiver may not be appointed for such a purpose. In *Farrimond v. State ex rel. Fisher*, 2000 OK 52, 8 P.3d 872, we explained that a receiver holds property and funds coming into the receiver's hands by the same right and title as the person or entity from whom the receiver has been appointed. *Id.* at ¶ 14, 8 P.3d at 875 quoting, *Norman v. Trison Development Corp.*, 1992 OK 67 ¶ 7, 832 P.2d 6.

¶ 34 Defendants argue that Marsha Schubert and the investors in her financial schemes do not possess any right or title to the funds in question, and thus the receiver has no such right. They argue that Jackson is not really suing on behalf of Schubert and her associated entities, but on behalf of the investors (creditors) and that a receiver in cases such as this, as a matter of law, does not have standing to sue on behalf of the investors. Their argument rests upon the following: "The rule is that the maker of the fraudulent conveyance and all those in privity with him—which certainly includes the corporations—are bound by it." *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir.), *cert. denied*, 516 U.S. 1028, 116 S.Ct. 673, 133 L.Ed.2d 522 (1995). In summary, the receiver is bound by the actions that were allegedly fraudulent and unjust. *Scholes* ultimately concluded that a receiver could bring an action to recover Ponzi-scheme profits, but its holding rests, in part, upon a receiver acting through a corporation. We reach the same conclusion as *Scholes* that a receiver may seek restitution from investors in a Ponzi scheme, but for a reason not expressed by the *Scholes* court.

¶ 35 This Court has explained on several occasions that when a corporation is being mismanaged and its property in danger of being lost to the stockholders through mismanagement, collusion, or fraud of its officers and directors, or through diversion of corporate property to individual officers, a court of equity has the inherent power to appoint a receiver for the property of such corporation to preserve the property of the corporation.[35] A similar principle is found in opinions discussing business trusts and associations, *Grohoma Growers Ass'n v. Tomlinson*, 1938 OK 32, 182 Okla. 17, 76 P.2d 404, as well as a joint venture where the parties possessed "rights and liabilities as between themselves were similar to or the same as those of partners." *Vilbig Const. Co. v. Whitham*, 1944 OK 259, 194 Okla. 460, 152 P.2d 916, 919. The commission of fraud by those exercising control in a commercial enterprise is a ground which supports the appointment of a receiver by a court. *Id.* 152 P.2d at 920.

¶ 36 A receiver controls property and claims for the ultimate benefit of the interested parties, including creditors, subject to claims and defenses possessed by all interested parties. For example, in *Harn v. Smith*, 1921 OK 328, 85 Okla. 137, 204 P. 642, we stated the following:

> The receiver of an insolvent, nongoing corporation takes the property of the company for the creditors, subject to such equities, liens, or incumbrances, whether created by operation of law or by act of the corporation, which existed against the property at the time of his appointment.

*Id.* at 647.

Historically, a receiver's primary duty was to take charge of a debtor's assets and make pro rata payments of all debts. D. Dobbs, *Handbook on the Law of Remedies,* § 2.12, n. 43, (1973) citing R. Clark, *Receivers*, § 232 (2d ed. 1929).

**35.** *Boynton Gas & Elec. Co. v. Mosier*, 1937 OK 119, 65 P.2d 448, 450 quoting *Anglo–American Royalties Corporation v. Brentnall*, 1934 OK 53, 29 P.2d 120. *See also White v. Tullahassee Realty Co.*, 1921 OK 189, 198 P. 584, 585–586.

¶ 37 While the power to appoint receivers is governed by statute, when deciding non-statutory receivership issues the court must look for guidance to the established usages and customs prevailing in the courts of equity. *Smoot v. Barker*, 1944 OK 319, 194 Okla. 540, 153 P.2d 227, 228. A receivership is ancillary or auxiliary to proper equitable relief; that is, such relief is a provisional remedy granted only in connection with an action for some other purpose. *Fidelity Trustee & Deposit Co. v. Certified Oil Properties*, 1941 OK 250, 119 P.2d 83, 84; *Harris v. National Loan Co.*, 1934 OK 624, 169 Okla. 457, 43 P.2d 1038, 1040. In discussing the equitable rights of members in an association, this Court stated, "The flexible rules of equity apply in all such cases, and the courts of equity are always open to those wronged by the acts of mismanagement of the officers." *Grohoma Growers Ass'n v. Tomlinson*, 76 P.2d at 407.

¶ 38 In summary, a receivership is a procedural vehicle to protect the underlying equitable rights possessed by stockholders, partners, joint venturers, and members of an association to funds that have been grossly mismanaged and dissipated by fraud. The protection of those equitable rights includes applying flexible procedural rules to effectuate the protection of equitable substantive rights possessed by those who participated in a business relationship, whether by corporation, business venture, or association. The property taken by Receiver in this case includes those equities that are attached to the property created by law or acts of Schubert, and the property is subject to all setoffs, liens, and encumbrances. *Harn v. Smith*, *supra*. To deny a receiver the ability to litigate the equitable rights of the Ponzi investors in this case because of Schubert's choice of using, or not using, a particular business vehicle would elevate procedure over substance in an equitable proceeding where flexible rules of procedure are used to guarantee equity. We therefore hold that a court-appointed receiver for the failed business ventures of a Ponzi-scheme operator may seek equitable relief against Ponzi-scheme investors.[36]

## V. Tracing and Setoffs

¶ 39 Appeal No. 105,682 is from a certified interlocutory order issued in Oklahoma County District Court Cause No. CJ-2005-3799 granting a partial summary adjudication. The three issues certified by the trial court are:

1. Whether the Department is required to trace funds received by the investor as belonging to other investors in order to prove unjust enrichment and require disgorgement of such monies?

2. Whether the Department may recover monies received by the investors under a Ponzi scheme based on the theory of unjust enrichment?

3. Whether the Pollards are entitled to setoff or offset against any monies ordered to be disgorged?

¶ 40 The United States Supreme Court has recognized that, in equity, certain tracing rules should be suspended. *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 427, 68 L.Ed. 873 (1924). One federal court explained *Cunningham*'s tracing analysis this way:

In *Cunningham*, creditors argued that they were rescinding their contracts with Ponzi because of fraud. They attempted to use a tracing presumption to remove their money from a fund before other defrauded creditors could reach it. Although their money had been removed from the bank account, the creditors argued that if a fund is composed partly of the wrongdoer's money and the defrauded person's money, the court should presume the wrongdoer has removed his money and left the victim's money in the account. 265 U.S. at 12, 44 S.Ct. at 427. However, the Supreme Court recognized that the other money in the account belonged to other victims, not Ponzi, and that the use of this presumption would harm other victims. 265 U.S. at 13, 44 S.Ct. at 427. Moreover, since these creditors occupied the same

---

**36.** Due to our holding we need not address whether the assignment of claims to the receiver by a few investors to the Ponzi scheme may serve as an independent basis for the receiver seeking equitable relief against the investors who received more than their initial investments.

legal position as other creditors, equity would not permit them a preference; for "equality is equity." *Id.*

*Securities and Exchange Commission v. Elliott, et al.,* 953 F.2d 1560 (11th Cir.1992), *rev'd in part,* 998 F.2d 922 (11th Cir.1993). Generally, we agree with *Cunningham* that when a Ponzi-scheme operator has commingled funds of several Ponzi-scheme investors with the operator's funds the Department need not show that the funds received by the innocent investor came from a defrauded Ponzi-scheme investor. However, the Pollards claim that this tracing is necessary because they gave amounts to Schubert for investment in addition to the Ponzi-scheme investments.

¶ 41 The Pollards allege that over an eleven year period more than $616,626.00 was invested with Shubert. Barry Pollard alleges that he obtained a judgment against Schubert in the amount of $827,000.00 in the District Court of Logan County. The Pollards were assigned a claim from L & S Pollard Farms, L.L.C. against Schubert in the amount of $284,464.05. L & S Pollard Farms, L.L.C. is designated as a "short investor" and is purportedly one of the investors for which the Department seeks equity. The Department alleges that the Pollards invested $59,100 "with Receivership Subjects and received, directly or indirectly, $445,268.06 in return, for a net gain of $386,158.06." Pollard alleges that the Department's lawsuit for equitable relief is "seeking disgorgement for monies that the Department alleges the Pollards received out of the same transactions for which the Pollards obtained their judgment against Schubert." There are contested facts concerning the source of the monetary obligation reduced to judgment in the amount of $827,000.00 and whether it involves the same commingled accounts used in the Ponzi scheme, the amounts invested by Pollard in the scheme, the amounts invested by Pollard with Schubert in other investments, and the amounts received by Pollard attributed to the Ponzi scheme.

¶ 42 The Department's unjust enrichment action recognizes, according to the Department, that money received from Schubert's Ponzi scheme should be offset by money invested in the scheme. This is, of course, a form of tracing. The Department is tracing funds into and out of the scheme, and apparently omitting funds from its calculations that it contends are not involved in the scheme. The Department uses both the phrase "Receivership subjects" as well as specific bank accounts to determine the status of Ponzi funds. In the record on appeal the Department's filings do not link specific bank accounts with specific receivership subjects for the purpose of the Pollards' claims, and that fact issue is not before us in these proceedings. The record does *appear* to show that Schubert's clients, including the Pollards, could receive funds from securities accounts that were unrelated to the Ponzi scheme.

¶ 43 Schubert had access to several accounts and commingled many of them with investor and personal funds. We agree with the Department that a simple netting out of funds received and deposited into accounts used for the Ponzi scheme with disbursements from those accounts to investors is a sufficient method to show whether an investor received his initial investment and a profit or loss thereon. However, we also agree with the Pollards that if Schubert's Ponzi-scheme funds were used to pay a legitimate non-Ponzi investment dividend, such payment does not represent a return on the Ponzi investment and should not be considered for the unjust enrichment claim. We agree with the Department that the facts of the nature of a legitimate investment and the alleged dividend payments are facts in the nature of an affirmative defense [37] to be pled by the Pollards and should not be considered

---

**37.** The nature of Pollard's allegations sets up proof of new and additional facts concerning how Schubert used the receivership entities to pay legitimate investment dividends, and as such have the nature of an affirmative defense. *See, e.g., Schulte v. Starritt,* 1940 OK 479, 110 P.2d 611, 612 ("If the defense, whether specifically pleaded, or asserted under a general denial, does not merely negative the title and right of possession of plaintiff, but seeks to avoid it by proof of a new and distinct proposition or state of facts, such defense is affirmative in its nature.").

as an element of the unjust enrichment claim brought by the Department.

¶ 44 In *Securities and Exchange Commission v. Elliott, supra,* the court stated that the right to setoff exists where there are mutual debts between parties,[38] and other federal courts have recognized a strong federal policy to allow setoffs.[39] A receiver's argument that a setoff creates, by itself, an inequitable preference has been repeatedly rejected.

> The Receiver argues that if Hagstrom is allowed a setoff, he will receive a preference over other creditors. While other creditors will only receive a percentage of their investments, Hagstrom would receive, up to $280,000, a dollar per dollar return on his investment. The Receiver's argument has been rejected repeatedly for almost a century. As early as 1892, the United States Supreme Court recognized that if a debtor has a valid right to a setoff, it is not a preference. *Scott v. Armstrong,* 146 U.S. 499, 13 S.Ct. 148, 151, 36 L.Ed. 1059 (1892). Despite having the effect of a preference, a setoff is a long-recognized right and is generally favored. *Cumberland Glass Mfg. Co. v. De Witt & Co.,* 237 U.S. 447, 455, 35 S.Ct. 636, 639, 59 L.Ed. 1042 (1915); *In re Applied Logic Corp.,* 576 F.2d 952, 957 (2d Cir.1978); *Bohack,* 599 F.2d at 1165. Equity's general principle of equality among creditors is not an appropriate consideration when considering whether to grant setoff, which is itself equitable in origin. *Applied Logic,* 576 F.2d at 961; *Johnson,* 552 F.2d at 1079. Thus, if the Receiver is to prevail, he must do more than argue that Hagstrom is being treated better than other creditors.

*SEC v. Elliott,* 953 F.2d at 1573.

The receiver then argued in *SEC v. Elliott* that in a mass fraud scheme, such as a Ponzi scheme, a court should not allow setoffs. The Court rejected this argument.

> The Receiver argues that the special circumstances of mass fraud with hundreds of defrauded creditors require special rules, but this argument can only go so far. The cases of each creditor must be examined individually to determine the rights of that individual. The Receiver cannot, for the sake of expediency, group together claimants with different claims. The law recognizes a right to setoff, and courts are not "free to ignore [the setoff rule] when they think [its] application would be 'unjust.' " *Applied Logic,* 576 F.2d at 957. The Receiver fails to cite any cases which grant an exception to the setoff rule in a situation similar to this one.

*SEC v. Elliott,* 953 F.2d at 1573, citing *(In re Applied Logic Corp.,* 576 F.2d 952, 957 (2d Cir.1978)).

Although this federal jurisprudence is not controlling, it agrees with the equitable principles adopted by this Court in its precedential opinions.

¶ 45 In *Jones v. England,* 1989 OK 142, 782 P.2d 119, we said that: "Insolvency of one of the parties may create an equity, or at least strengthen it, sufficient to allow a setoff of the mutual obligations." *Id.* at 122, citing 3 J. Story, *Commentaries on Equity Jurisprudence,* § 1872 (14th ed. 1918). We then explained the "grave injustice" of denying a setoff.

> The grave injustice of denying a setoff . . . is no less an injustice when an insolvent plaintiff is bringing suit on a guaranty agreement and the defendant desires to setoff the guaranty obligation with payments allegedly made to the plaintiff. Thus, we hold that Howard's counterclaim raises a permissible defense to the action on the guaranty.

*Jones v. England,* 1989 OK 142, 782 P.2d at 122 (material omitted).

This Court has recognized that a court applying equity may use one judgment

---

**38.** *Securities and Exchange Commission v. Elliott,* 953 F.2d at 1572, citing, *Lowden v. Northwestern Nat'l Bank & Trust Co.,* 298 U.S. 160, 56 S.Ct. 696, 698, 80 L.Ed. 1114 (1936).

**39.** *Securities and Exchange Commission v. Elliott,* 953 F.2d at 1572, citing, *Bohack Corp. v. Borden, Inc.,* 599 F.2d 1160, 1165 (2d Cir.1979); *In re Johnson,* 552 F.2d 1072, 1078 (4th Cir. 1977); *In re Williams,* 422 F.Supp. 342, 345 n. 4 (N.D.Ga.1976).

to setoff another judgment.[40]   A judgment debtor may purchase a judgment to setoff another judgment "if this be done bona fide." *Johnson v. Noble*, 1936 OK 779, 179 Okla. 256, 65 P.2d 502, 504.   But "the power to offset judgments will not be exercised so as to work injustice to the interests of third persons acquired in good faith." *Id.*

■■■■■ ¶ 46 The record does not state whether the $827,000.00 judgment against Schubert relates to Ponzi-scheme activities or non-Ponzi investments.   The Department offsets dividends against Ponzi investments and thereby limits setoff calculations to Ponzi-related funds.   We decline to hold that the right of an investor to an equitable setoff by a judgment against the operator of the Ponzi scheme is dependent upon whether the judgment relates to the Ponzi scheme.   Separate judgments used in equity to setoff obligations are, or least should be, based upon different or separate causes of action or separate transactions and occurrences.   This is so because a judgment is the final determination of the rights of the parties where the cause of action is merged into the judgment, and separate judgments on the same claim (or cause of action) do not usually coexist without issues frustrating their enforcement such as preclusion, estoppel, and splitting a cause of action.[41]   Thus, separate judgments used for an equitable setoff will not both arise from the Ponzi scheme.

¶ 47 The Department is seeking equity, and doing equity depends upon the circumstances of individual parties.   The fact that a massive fraud scheme was used does not change the nature of equity.   As observed in *SEC v. Elliott, supra,*

> A claimant is not treated better in the eyes of the law if the controlling facts surrounding his or her case lead to a different legal conclusion.   To argue that all claimants should be treated similarly, without presenting facts, is an empty argument.   One of the basic purposes of law and the courts is to determine which facts are legally relevant or irrelevant.   If relevant facts differ, then the law will treat the claimants differently.   Thus, it is incorrect to say the law prefers one claimant if that claimant's situation differs in a legally cognizable way.

*Id.* 953 F.2d at 1573

Doing equity in this State, since at least the 1916 opinion of *Elms v. Arn*, 1916 OK 718, 59 Okla. 235, 158 P. 1150, has included recognizing that a court of equity may use a judgment to offset another judgment.

¶ 48 The Department challenges the right of the Pollards to use the judgment obtained against Schubert with the argument that privity of parties is necessary for a setoff, and that the judgment is not against the Department.   In *Sarkeys v. Marlow*, 1951 OK 195, 205 Okla. 15, 235 P.2d 676, we said "There must be privity of parties in order to enable a defendant to plead and prove a setoff, and defendant cannot plead and prove a set-off in favor of himself and against one who is not a party to the suit." *Sarkeys*, 235 P.2d at 679, citing *Van Arsdale v. Edwards*, 1909 OK 138, 24 Okla. 41, 101 P. 1123; and *Hurford v. Norvall*, 1913 OK 590, 39 Okla. 496, 135 P. 1060.

¶ 49 We have explained herein that setoffs are proper when a receiver presses claims for unjust enrichment based upon a Ponzi scheme.   The Department's argument is thus based upon the idea that although equity may require a setoff if the receiver is a party, the same rule of equity does not apply when the Department is the party pressing for payment.   Equity elevates substance over form.   *Cobb v. Whitney*, 1926 OK 920, 124 Okla. 193, 255 P. 577.   In this case the *sole*

---

40.   *Widick v. Phillips Petroleum Company*, 1937 OK 463, 70 P.2d 474, 476; *Johnson v. Noble*, 1936 OK 779, 65 P.2d 502, 504; *State ex rel. Barnett v. Wood*, 1935 OK 372, 43 P.2d 136, 137; *Elms v. Arn*, 1916 OK 718, 158 P. 1150, 1151 quoting *Schuler v. Collins et al.*, 63 Kan. 372, 65 P. 662 (1901).

41.   A judgment is the final determination of the rights of the parties in an action.   12 O.S.2001 § 681.   Upon entry of a judgment the cause of action is merged into the judgment and the cause of action ceases to exist. *Johnson v. State ex rel. Department of Public Safety*, 2000 OK 7, ¶ 9, 2 P.3d 334.   There can only be one "judgment" or one final judicial determination upon a single cause of action. *Federal Deposit Ins. Corp. v. Tidwell*, 1991 OK 119, ¶ 5, 820 P.2d 1338.

claim brought by the Department is an equitable claim against one class of investors for restitution to another class of investors. The Department's claim for unjust enrichment is, like the receiver's, based upon the conduct of Schubert and the Ponzi-scheme. When the Department seeks the "complete relief in equity" as it has argued herein, it cannot be heard to complain when the same rule of equity applied to a receiver is applied to the Department's receiver-like claim. We hold that the Department's quest for equity is subject to a legitimate equitable setoff in the form of a judgment against Schubert.

¶ 50 We have answered the first two certified questions by our opinion. The third, whether the Pollards are actually entitled to a setoff, cannot be answered today. Whether a setoff should be granted or denied, based upon the disposition of certain non-Ponzi investments and the calculation of Ponzi-scheme investments and Ponzi-scheme dividends, cannot be made due to the uncertainty of the facts in the record before us. Similarly, whether the assignment of the claim to the Pollards from L & S Pollard Farms, L.L.C. in the amount of $284,464.05 was a bona fide assignment for value, in addition to other potential issues relating to this claim, are not determinable from the record before us and were not determined by the trial court in the first instance. Finally, we note that this proceeding is on certiorari review from the District Court of Oklahoma County, the truncated District Court record on appeal does not appear to contain the judgment roll of the proceeding in the District Court of Logan County which resulted in a judgment or a certified copy of that judgment, and the District Court's ruling on a partial summary adjudication did not reach the factual issue of the existence of the judgment and the equity of its application. We decline to adjudicate these issues in the first instance and they must be left for the District Court on remand.

## VI. Application of the Court's Holdings to the Individual Appeals

¶ 51 The assignments of error in appeal Nos. 104,004, 104,161, and 104,262 consolidated with 104,304, challenge summary judgments granted in the same action in the District Court for Oklahoma County, Cause No. CJ–2005–3796 (consolidated with CJ–2005–3299). The petitions for certiorari in these appeals challenge the Department's action against innocent investors and the ability of the court-appointed receiver to seek equitable refunds from innocent investors who received more than their original investments.

¶ 52 Summary judgment was granted based upon the principle that a profit to a Ponzi-scheme investor is, as a matter of law, unjust enrichment, and subject to an action by the Department for restitution. We have rejected that concept today and explained that equitable recovery against an innocent investor must be based upon that investor's receipt of an unreasonably high dividend on his or her investment, a mixed question of law and fact that must be decided by the trier of fact on remand.

¶ 53 The substantive equitable rights sought to be vindicated by the court-appointed receiver's unjust enrichment claim against the innocent investors are no greater in scope than those by the Department against the innocent investors. Judgment for the receiver must be based upon the investor's receipt of an unreasonably high dividend on his or her investment, an issue that must be decided by the trier of fact on remand.[42]

¶ 54 A moving party is entitled to summary judgment as a matter of law only when the pleadings, affidavits, depositions, admissions or other evidentiary materials establish that no genuine issue of material fact exists. *Miller v. David Grace, Inc.*, 2009 OK 49, ¶ 10, 212 P.3d 1223, 1227; *Davis v. Leitner*, 1989 OK 146, ¶ 9, 782 P.2d 924, 926. Our *de novo* review on summary judgment determines whether a trial court erred in its application of the law. *Young v. Macy*, 2001 OK 4, ¶ 9, 21 P.3d 44, 47. Due to the mixed question of fact and law whether the investors' individual returns were unreasonably

---

42. Due to our holdings today which reverse the judgments of the District Court we need not discuss the procedural/substantive rights of the court-appointed receiver versus those of the Department when both seek recovery of the identical Ponzi-scheme unreasonable dividend.

excessive, the summary judgments must be reversed. The summary judgments granted against Defendants in Okla. County Cause No. CJ–2005–3796 (consolidated with CJ–2005–3299) and challenged herein in Okla. Sup.Ct. Nos. 104,004, 104,161, and 104,262 consolidated with 104,304, are hereby reversed and the causes remanded to the District Court for further proceedings consistent with this opinion.

¶ 55 Appeal No. 105,682 is an appeal of a certified interlocutory order issued in Oklahoma County District Court Cause No. CJ–2005–3799 which granted the Department a partial summary adjudication after the trial court declined to consider the Pollards' arguments and claims relating to setoffs. The opinion herein explains that an equity claim for unjust enrichment allows for equity defenses based upon setoffs. Whether the facts support setoffs for the Pollards is an issue for adjudication by the trial court upon remand. The partial summary adjudication was based upon the concept that unjust enrichment is based merely upon whether an innocent investor received more than his or her initial investment. The opinion herein shows that unjust enrichment must be based upon an unreasonable dividend obtained by a defendant. The record on appeal shows contrary allegations of fact concerning how much the Pollards invested with Schubert, the nature of those investments, and which should be attributed to the Ponzi scheme. A genuine issue of fact exists concerning the nature of the Pollards' investments and dividends. The summary adjudication for the Department must be reversed. *Young v. Macy, supra; Miller v. David Grace, Inc., supra.* The cause is remanded for further proceedings consistent with this opinion.

## VII. Conclusion

¶ 56 The Oklahoma Legislature could expressly state that the Department is authorized to seek equitable relief against innocent investors in a Ponzi scheme for the benefit of other innocent investors and define the rights and liabilities of such investors in such proceedings. There is nothing in the record submitted by the Department showing that the Oklahoma Legislature has *expressly* considered and weighed the competing equities of the two classes of innocent investors. We have declined to adopt the Department's view that every innocent investor who received a return on his or her investment in excess of the initial investment has, as a matter of law, been unjustly enriched and is subject to an action seeking equitable restitution brought by either the Department or an appropriate court-appointed receiver. We have instead opted for defining the presence of unjust enrichment upon the true nature of a Ponzi-scheme and its perpetuation—the payment of an unreasonably high dividend. Innocent investors ignorant of the Ponzi scheme may not hide behind their ignorance when unreasonably high dividends are paid to them and then claim that their high dividends are insulated from equity.

¶ 57 We recognize that our opinion precludes recovery from innocent investors who receive a reasonable rate of return, or even less than a reasonable rate of return and after several years recover their investment. The Department's arguments herein do not address what course of conduct an innocent investor should pursue if that investor wants to make a reasonable rate of return without fear of a potential District Court action for restitution of dividends at some unspecified time in the future. Should an investor segregate and hold financial profits until a statute of limitations or laches expires? In the alternative, should an innocent investor be held to a higher standard of accountability and inquiry concerning his or her investments placed with a licensed securities dealer? These and similar questions are for the Legislature should it consider if public policy requires unjust enrichment to be defined as the Department contends, or whether unjust enrichment should be defined, as we have here, based upon a reasonably-equivalent-value-exchanged model used in fraudulent transfers as interpreted by some courts.

¶ 58 EDMONDSON, C.J., TAYLOR, V.C.J., OPALA, COLBERT, and REIF, JJ., concur.

¶ 59 HARGRAVE, KAUGER, WINCHESTER, JJ., dissent.

¶ 60 WATT, J., not participating.

WINCHESTER, J., dissenting, with whom HARGRAVE and KAUGER, JJ. join:

¶ 1 I respect the fact that the majority opinion labors to determine how to achieve equitable treatment for equally innocent investors in a Ponzi scheme. After carefully considering this Court's struggle and its rationale behind the holdings, I am persuaded that no answer to the issues raised in the opinion is quite satisfactory. But of the difficult choices, I am convinced that the Court's choice is not the best option.

¶ 2 The majority opinion begins with a question, which is whether the Department of Securities has the authority under the Oklahoma Uniform Securities Act to force innocent victims of a Ponzi scheme to return money they received that exceeded their original investment. The opinion ends with questions. "Should an investor segregate and hold all financial profits until a statute of limitations or laches expires? ... [S]hould an innocent investor be held to a higher standard of accountability and inquiry concerning his or her investments placed with a licensed securities dealer?" From the wording, one would expect the answers to these questions to be "No." Instead, the majority holds that the full power of the law may be employed to force those innocent investors to "disgorge" unreasonable profits. The opinion leaves the district court with unsatisfactory subjective standards to determine what profits are unreasonable. Such a conclusion seems to invite a subsequent appeal.

¶ 3 The dissent to the Court of Civil Appeals was correct in concluding that there is simply no authority to grant power to the receiver in this case for bringing unjust enrichment claims against those innocent investors who profited from the Ponzi scheme. This Court's majority opinion recognizes that the inequity in forcing restitution of profits from innocent investors has kept some courts from ordering such "restitution."[1]

¶ 4 The *Johnson v. Studholme* case quoted by the majority illustrates the dilemma:

"Some investors who received 'fictitious profits' may have spent the money on education or other necessities many years ago."[2] Then the federal district court's opinion observes that spending their investment money for necessities violates neither equity nor good conscience.

¶ 5 The contrast is that some later investors who lost money may have been speculators who were willing to take great risks and were prepared to lose their investments. So, as *Johnson* correctly observes, there is no "neat answer." Are any of the innocent investors at fault for placing their money with a licensed security dealer? They have violated no law, nor is there any law requiring them to liquidate assets innocently purchased with what they believed to be lawfully obtained profits. As the *Johnson* court observes, "In such circumstances the courts may simply leave the parties where they were found."[3]

¶ 6 The Oklahoma Department of Securities appears to search for a deep pocket to reimburse innocent parties for their losses. Although that agency's motives may be just, the pockets they wish to empty belong to equally innocent parties. Since the Ponzi scheme began in December 1999, those profits could have been received almost ten years ago. The warning for investors now who are willing to take big risks with their funds is this, not only do you risk your money when you first invest it, you also risk a subsequent government intervention to take back the funds. The remedy supplied by this Court potentially does greater damage to innocent investors than the damage done if this Court were to leave all innocent investors where they now stand. Ultimately the individual must be responsible for investigating before investing. Accordingly, I respectfully dissent.

---

1. *Johnson v. Studholme*, 619 F.Supp. 1347, 1350 (D.Colo.1985), *aff'd*, 833 F.2d 908 (10th Cir. 1987) and quoted in ¶ 27 of the majority opinion of this Court.

2. *Johnson*, 619 F.Supp. at 1350.

3. *Johnson*, 619 F.Supp. at 1350.